Filed 1/15/14 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE RIOS,<br><br>    Defendant and Appellant. | H038487<br>(Monterey County<br>Super. Ct. Nos. SS102818A,<br>SS111533C)<br><br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING**<br><br><br>**NO CHANGE IN THE JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on December 20, 2013, be modified as follows:

1.  On page 21, in the first full paragraph, the second sentence, which states:

    The Attorney General does not address the legal question whether a lone actor may be subject to the section 186.22(b)(1) gang enhancement.

    is deleted and the following sentence, which includes the addition of footnote 8, is inserted in its place:

    The Attorney General responds that "*Rodriguez*'s holding applies solely to the substantive crime of street terrorism" and does not apply to enhancements.[8]

2.  Add the following to page 21 as footnote 8, which will require renumbering of all subsequent footnotes:

    [8] The Attorney General placed this argument in a section of its brief that responded to alleged errors in the jury instructions, under the subheading

"The trial court properly instructed the jury," rather than placing it under its own separate heading. (See Cal. Rules of Court, rule 8.204(a)(1)(B) ["Each brief must: . . . [s]tate each point under a separate heading or subheading summarizing the point"]; Eisenberg, et al. Cal. Practice Guide: Civil Writs and Appeals (The Rutter Group 2013) ¶¶ 9:150-9:152, pp. 9-46 to 9-47 [placing an issue within another discussion heading runs the risk that the court will not address it].)

The petition for rehearing is denied.

There is no change in the judgment.

Dated:_____        _____
                                     Márquez, J.



                                     _____
                                     Elia, Acting P.J.



                                     _____
                                     Bamattre-Manoukian, J.

People v. Rios
H038487

2

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JOSE RIOS,<br><br>　　　　Defendant and Appellant. | H038487<br>(Monterey County<br>Super. Ct. Nos. SS102818A,<br>SS111533C) |

Defendant Jose Rios was convicted by jury of one count of carrying a loaded firearm in a vehicle (Pen. Code, § 12031, subd. (a)(1)[1]; count 1), one count of vehicle theft (Veh. Code, § 10851, subd. (a); count 3), and one count of street terrorism (§ 186.22, subd. (a); count 4). The jury also found true enhancement allegations that defendant was not the registered owner of the firearm (§ 12031, subd. (a)(2)(F); enhancement to count 1) and that he carried the loaded firearm and committed the vehicle theft for the benefit of a criminal street gang (§ 186.22, subd. (b), enhancements to counts 1 and 3). The jury was unable to reach a verdict on the allegation in count 2 that defendant carried a concealed firearm in a vehicle within the meaning of section 12025, subdivision (a)(3); the court declared a mistrial on that count.

Based on the Supreme Court's holding in *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*) that a person who acts alone cannot be convicted of street terrorism (§ 186.22, subd. (a)), defendant argues that his conviction on the street terrorism count must

_____

[1] All further unspecified statutory references are to the Penal Code.

be reversed since there was no evidence he acted with other gang members. We agree and accept the Attorney General's concession on this issue. Defendant contends further that *Rodriguez* also applies to gang enhancements (§ 186.22, subd. (b)) and that the true findings on the gang enhancements must be reversed because there was no evidence that he committed the offenses in counts 1 and 3 with other gang members. We will conclude that the holding in *Rodriguez*--that a lone actor cannot violate section 186.22, subdivision (a)-does not apply to the separate enhancement set forth in section 186.22, subdivision (b), which enhances punishment when a defendant is found, among other things, to have acted with the specific intent to further, promote or assist in criminal conduct by gang members. But we agree with defendant's contention that there was insufficient evidence to support the gang enhancements (§ 186.22, subd. (b)(1)) in this case. In light of our conclusions, we need not address defendant's instructional error claims. Defendant also contends that the court erred when it imposed a second restitution fine (§ 1202.4), a second court facilities assessment (Gov. Code, § 70373) a second court security fee (§ 1465.8, subd. (a)(1)), and when it calculated the amount of the parole revocation restitution fine (§ 1202.45). We agree that there were errors regarding those fines and fees. In light of our conclusions, we will strike the conviction for street terrorism (§ 186.22, subd. (a); count 4) and the true findings on the gang enhancements (§ 186.22, subd. (b)(1); counts 1 and 3), reverse the judgment, and remand to the trial court for resentencing and to correct the errors in the fines and fees.

**FACTS**

*Prosecution Case*

**Testimony of Maria Garcia & Jacqueline Andrade**

In December 2010, Maria Garcia drove her Chrysler New Yorker with Idaho plates (the Chrysler) from Sun Valley, Idaho, to Sacramento, California, where her son

was attending college. Garcia's close family friend, Jacqueline Andrade, met Garcia in Sacramento. Andrade needed a car and was considering buying the Chrysler. Garcia gave Andrade permission to take the car to her home in Salinas for a "test drive" and to show it to her (Andrade's) husband.

Before giving the car to Andrade, Garcia removed her personal belongings from the car. She left the owner's manual, registration card, and identification cards that belonged to her son, Jose Ramirez, in the glove box. She did not leave any clothing in the passenger compartment, but may have left some of her son's clothing in the trunk.

Andrade drove the car to Salinas on December 24, 2010. The following day, Andrade hosted a Christmas party at her house. There were about 30 people at the party; Andrade knew only 12 or 13 of them; the rest were friends of her guests. Before the party, Andrade washed the Chrysler; she also vacuumed the interior of the car, including under the seats. She testified that there was nothing in the passenger compartment except for photos and paperwork in the glove box.

Andrade's party lasted until 4:00 a.m. on December 26, 2010. After awakening around noon that day, Andrade discovered that the Chrysler and the car keys were gone. She had left the car keys on her kitchen counter and last saw the car around 4:30 p.m. the day before. Andrade called the police and reported that the Chrysler had been stolen.

### Testimony of Officer Lopez & Maria Magana

At 11:30 p.m. on December 25, 2010, California Highway Patrol (CHP) Officer Pablo Lopez and his partner, Officer Hamilton, were traveling on Williams Road in Salinas in a marked car when they saw the Chrysler at the intersection of Williams Road and Alma Avenue with a cracked windshield.[2] Since a cracked windshield is a Vehicle

---

[2] Garcia testified that the car was in "perfect shape" when she gave it to Andrade, from which one may infer that the windshield was not cracked at that time.

3

Code violation, the officers decided to make a traffic stop. Lopez testified that defendant, who was wearing a black baseball cap, was driving the car. Neither Andrade nor Garcia knew defendant. They did not give defendant permission to drive the Chrysler.

The officers followed the Chrysler for approximately 10 blocks along a circuitous route that suggests defendant was trying to evade the officers. Along the way, defendant made a wide right turn onto northbound First Avenue and drove partly in the southbound lane, on the wrong side of the road. Officer Hamilton was driving; as soon as he turned on his emergency lights, defendant turned right onto Saint Joseph Circle, a cul-de-sac. Defendant made a U-turn at the end of the cul-de-sac, parked in front of 11 Saint Joseph Circle, and turned off the car's headlights. Defendant then pulled the car into the driveway of 6 Saint Joseph Circle. He stepped out of the car and walked toward the front door of the house. Just before he got to the door, defendant turned and walked toward First Avenue, where the officers had parked their car.

The officers approached defendant and told him they were stopping him for the cracked windshield and driving on the wrong side of the road. Defendant said he was 18 and they could not search him. Defendant gave the officers a false name (Juan Rios) and a false date of birth. Defendant told the officers he did not have a driver's license or identification. Officer Lopez ran the information defendant gave him through dispatch and was told that no driver's license had been issued to that person.

When Officer Lopez asked defendant why he was driving so recklessly, defendant denied that he was driving the car, claiming instead that his girlfriend was driving. Officer Lopez had not seen anyone else in the car or exiting the car, so he asked defendant to provide his girlfriend's name and her whereabouts. Defendant did not give the officer his girlfriend's name, but said she was at her home at 6 Saint Joseph Circle.

Officer Lopez knocked on the door of 6 Saint Joseph Circle and spoke to Maria Magana. He asked Magana if she had a daughter who had just gotten home who had a boyfriend named "Juan Rios." Magana said that there was no girl who lived there who

4

had a boyfriend and that the Chrysler did not belong to anyone who lived there.  At trial, Magana testified that she had a daughter who was a student at Chico State University, that her daughter did not have a boyfriend, and that her daughter had spent Christmas night at home.  Magana did not know defendant and did not recognize the Chrysler.

Because defendant did not have a driver's license, the officers decided to impound the Chrysler; they conducted an inventory search of the car before arranging to have it towed.  (At that point, the Chrysler had not yet been reported stolen.)  During the search, the officers found a black knit beanie in the trunk, a black Oakland Raiders baseball cap on the backseat, some shirts and a pair of slacks in the trunk, a letter that had "gang writing" and the phrase "northern killer" in it in the glove box,[3] and a gun under the front passenger seat.  The officers found Jose Ramirez's (the Chrysler owner's son's) identification cards on the floorboard in front of the front passenger seat.  The officers also found a bag of marijuana.

The black beanie had the word "Salinas" embroidered in red letters on the front and a red "[H]uelga bird" embroidered on the back.  The baseball cap had the phrase "Raiders 4 Life," the area codes for both Oakland and Salinas, four dots, and four stars drawn on the underside of the bill.  Garcia testified that neither the beanie nor the baseball cap belonged to her son.

The gun (a .38-caliber Arminius Titan Tiger revolver) had been carefully wrapped in a white T-shirt that was folded over the gun two or three times.  The gun was loaded and had black electrical tape wrapped around the handle.  It was not registered.  Garcia testified that the gun was not in the car when she gave it to Andrade.  Andrade testified that before the car was stolen, she cleaned and vacuumed the car, including under the seats, and did not find any guns.

---

[3]  Officer Lopez testified about the contents of the letter; the letter itself was not in evidence.

Defendant had "Salas" (which refers to the city of Salinas) tattooed in large letters across his chest, "Rios" tattooed in large letters on the back of his neck, and "Karina" tattooed on the right side of his neck. Since the dispatcher was unable to find any information under the name and date of birth defendant had given him, Officer Lopez called Salinas Police to see if they could identify defendant by his tattoos based on information in their gang database. A Salinas Police officer identified defendant as Pedro Rios Casanova with a date of birth of November 14, 1991. Officer Lopez asked defendant if that was his name and date of birth and defendant said, "Yes, that's me."

After informing defendant of his *Miranda*[4] rights, Officer Lopez asked defendant if he wanted to speak with him and defendant said he did. Defendant said he was not driving the Chrysler. Defendant said he did not know anything about the gun, but told Officer Lopez that he would not find any fingerprints on it. The officers did not find the keys to the Chrysler on defendant's person.

At booking, the intake officer asked defendant if he belonged to a gang and defendant said that he was a Norteño and that Sureños were his enemies. When asked if he wanted to be housed with other active Norteños, defendant said, "Yes." At the end of the booking process, defendant told the officers his real name was Jose Rios and his date of birth was November 14, 1992. At the jail, Officer Lopez looked through defendant's cell phone and found photographs of (1) Salinas Police officers conducting traffic stops, (2) the letter "L" in a font that matched the letters in defendant's chest tattoo, and (3) the letters "NS." According to Officer Lopez, "NS" is a gang reference; it stands for "Northside."

The officers never found the keys to the Chrysler. Since the keys were small, it is possible defendant dropped them as he walked toward the officers, without the officer

---

[4] *Miranda* v. *Arizona* (1966) 384 U.S. 436.

6

seeing it.  There was no evidence that anyone started the car with a screwdriver or "punched" the steering column.

### Testimony of Deputy Dorgan

Monterey County Sherriff's Deputy Cynthia Dorgan works in the classification unit of the county jail.  Her duties include maintaining the safety and security of the jail by making sure inmates, especially gang members, are assigned to the proper housing units.  The jail housing units include separate dorms for (1) people who do not associate with gangs, (2) Norteño gang members and associates, (3) Sureño gang members and associates, (4) parolees, and (5) persons who have been sentenced.  The jail also has "lockdown pods" for gang members who are arrested for serious crimes or are disruptive, protective custody dorms and cells for inmates who are at risk of being assaulted by other inmates (i.e., sex offenders, "snitches," and gang "dropouts"), and maximum security, single cell isolation units.  Gang members who are neither Norteños nor Sureños (i.e., Bulldogs from Fresno or Hell's Angels) are housed separately from other gang members.

Upon intake, the deputies interview the inmates and complete an inmate screening questionnaire (ISQ).  The deputies also check computer records to determine whether the inmate has been in custody before and, if so, where the inmate was housed previously.  Regarding gang affiliation, inmates are asked whether they are gang members, associate with gangs, or have family members who are in gangs.  After the deputies fill out the ISQ's, the inmates review and sign them.  Upon intake, defendant stated that he was a "Northerner associate."  Defendant was housed in the K-5 pod, a dormitory for active Norteño gang members and their associates.

Deputy Dorgan testified that if a person is not in good standing with the gang, he will be "rolled up" (turned away or assaulted) within seconds of entering a gang dormitory.  When an inmate enters a gang dormitory, the inmates conduct their own screening.  After the deputies leave, the inmates search the new inmate's belongings.

7

The new arrival is sent to the bathroom, where he is searched. The new inmate is then placed on a second-tier bunk, where he completes paperwork. He remains on the bunk, under guard, while the rest of the inmates determine whether he is in good standing with the gang. If the inmate is not in good standing, his property will be rolled up and he will be told to leave. If an inmate who is not in good standing is not removed from the unit, he is likely to be assaulted. Defendant was not "rolled up" or assaulted while in the Norteño gang unit. Deputy Dorgan testified that if defendant had been placed in a dorm for non-gang members, the inmates there would have concluded that he was a Norteño based on his tattoos and he would have been excluded from that housing unit.

### Testimony of Officer Ted Rocha, the Prosecution's Gang Expert

CHP Officer Ted Rocha, a member of the Monterey County Joint Gang Task Force and the North Central Coast Gang Task Force, testified on behalf of the prosecution as a gang expert.[5]

Officer Rocha gave a history of the Norteño and Sureño street gangs. He explained that the Nuestra Familia prison gang was formed in Soledad State Prison in the 1960's; the Norteños are the street gang affiliated with Nuestra Familia. Officer Rocha described Salinas as "the hub or the mecca . . . for Norteños" and the "birthplace" of the Norteño criminal street gang. Salinas became a Norteño stronghold when gang members came to the area to be near their loved ones in prison. The Norteños are not the only gang in Salinas; other gangs, including the Sureños, are present. Compared to other cities, gang territory in Salinas is not always clear; there may be a mix of Norteños and Sureños living in and claiming the same area as their territory.

---

[5] Since Officer Rocha's qualifications to testify as a gang expert are not at issue on appeal, we shall not summarize the evidence regarding his qualifications.

Salinas has approximately 3,000 documented Norteño gang members. Norteños identify with the color red and the number 14 (because "N" is the 14th letter of the alphabet). The number 14 is displayed in a variety of ways, including the numbers "1" and "4" and 1 dot and four dots. Other Norteño symbols include the skater brand "Nor Cal" and the North Star.

Officer Rocha testified that the primary criminal activities of Norteños in Salinas include terrorizing people, robbery, burglary, murder, attempted murder, vehicle theft, possession of firearms, and narcotic sales. The prosecution solicited testimony from Officer Rocha and presented documentary evidence regarding the criminal activity and convictions of nine different Norteño gang members in Monterey County, several of whom had multiple convictions.[6] Three had been convicted of possession of a firearm by a felon coupled with either a gang enhancement (§ 186.22, subd. (b)(1)) or a conviction for street terrorism (§ 186.22, subd. (a)). One was convicted of permitting another gang member to carry a gun in her vehicle with a gang enhancement. One was convicted of attempted murder with a gang enhancement after he fired a gun at a car associated with Sureño gang members, injuring an innocent woman. Two were convicted of possessing drugs for sale with enhancements for possessing a firearm during a felony. Two had been convicted of transporting drugs. One was convicted of vehicle theft twice, and had a single conviction for misdemeanor street terrorism. One was convicted of street terrorism after officers found a gun in his home while he was on probation.

Officer Rocha also testified that tattoos are a "badge of honor" among gang members, that defendant's "Salas" tattoo is a reference to Salinas, and that gang members

---

[6] To subject a person to the penal consequences of section 186.22, the prosecution must prove, among other things, that members of the gang have, either individually or collectively, engaged in a " 'pattern of criminal gang activity' " by "committing, attempting to commit, or soliciting" two or more of the " 'predicate offenses' " enumerated in section 186.22. (*People v. Gardeley* (1996) 14 Cal.4th 605, 609, 616-617 (*Gardeley*).)

9

from Salinas are accorded higher status within the Norteño gang. The officer knew of ten active Norteño gang members who had the "Salas" tattoo. Officer Rocha opined that defendant's "Salas" tattoo was gang related, but that his other tattoos were not. Gang members used to have to earn their tattoos, by either making money for the gang or "putting in work" (i.e., committing crimes).

Officer Rocha testified that the black beanie in the Chrysler was gang-related because it contained the word "Salinas" in red and a red Huelga bird. Norteños have adopted the Huelga bird, a symbol of the farm workers' movement, as their own symbol. He said the four dots, the four stars, and the area codes on the Raiders cap were gang references. He explained that gang members associate with area code numbers, which often appear in gang tattoos. He also said that it is common for gang members to give officers false names; they do not like to use their real names or their "monikers" (i.e., street names). And he said the "NS" on defendant's cell phone was a gang reference to the "Northside." According to Officer Rocha, it is common for gang members to take photographs of the police like the ones on defendant's phone as a way of gathering intelligence on law enforcement practices. Defendant's phone also contained Norteño gangster rap music.

Officer Rocha testified that there is a difference between the terms "Northerner" and "Norteño." He said Norteños are unique among gangs because they have their own education system and gang members take classes. A "Norteño" is someone who has been educated within the organization; a "Northerner" is someone who associates with Norteños (i.e., goes to parties) but has not put in enough work to be a Norteño. Northerners, then, are gang members at a lower level. By saying he was a "Northerner associate" upon entering the jail, defendant stated that he had not put in enough work yet to be a Norteño, but he supported the organization. According to Officer Rocha, gang members know the ISQ forms are used as evidence in court and "downplay" their involvement in the gang to avoid being convicted of gang-related charges.

10

That defendant was housed in the K-5 pod at the jail without incident was significant to Officer Rocha. He corroborated Deputy Dorgan's testimony about the inmate screening process in the Norteño dorm. Officer Rocha explained that Norteños are very structured and that rank is important to them. The inmates have a "new arrival package" form that contains 31 questions; a new inmate's responses are reviewed by inmates throughout the unit. The inmates will not allow a non-associate to remain in the housing unit.

Officer Rocha testified regarding defendant's prior contacts with police. In October 2007, when he was 14 years old, defendant was involved in a fight at school. The other boy called defendant a "buster" (a derogatory term for Norteño); defendant called the other boy a "scrap" (a derogatory term for Sureño). At that time, defendant admitted his Norteño association. On May 20, 2009, when defendant was 16 years old, he admitted being a Norteño gang member in a contact with police. On May 28, 2009, defendant was again contacted by police regarding the theft of money by force. The victim reported that defendant and his friends were Norteños, that defendant wore Norteño clothing and talked about Norteños in class, and that he had threatened to shoot the victim if he reported the incident. At that time, defendant had Norteño music on his iPod and Norteño writings on his school folder and admitted hanging out with Norteños. In June 2009, the Gang Task Force did a legally authorized search of defendant's phone and found gang music and monikers for individuals from two Norteño subsets in Salinas--the SEM (Salinas East Market) and the Santa Rita Boys. In a search of defendant's home, officers found gang clothing, which defendant was not allowed to have. In January 2010, when defendant was 17 and on juvenile probation with full gang terms, Salinas Police contacted him in a documented Norteño area with three other Norteños who were also on probation. Based on this evidence, Officer Rocha opined that defendant was an active Norteño gang member when he was arrested in this case.

11

Officer Rocha testified that guns are status symbols for gang members. A person with a gun is armed all the time and other gang members go to him for help. Gang members share guns with other gang members; they trade them for drugs and sell them. They display guns to scare people and dissuade witnesses from testifying in gang cases. Stolen guns are known as "gang guns"; a gang member with a stolen gun generally does not keep it for himself. Instead, he lets other gang members know he has it and passes it around. The gang prefers that persons who do not have search terms keep such a gun. Most of the guns the police find on gang members have electrical tape wrapped around the handle or the trigger. That way, if the gun is used in a crime, a gang member can remove the tape and there are no fingerprints. Officer Rocha opined that a gang member with a firearm promotes, furthers and assists felonious conduct by other gang members. They use guns to protect their drug sales territory and other gang members. An unregistered gun is even more valuable because it cannot be traced back to the gang member. Further, a gang member with an unregistered, loaded gun in a vehicle benefits the gang because the gun is mobile. That the vehicle was a stolen vehicle reinforces the conclusion that the gang member carried the gun for the benefit of the gang. Most Norteños do not commit crimes in their own cars; they use stolen cars because they cannot be traced back to the gang member. Stealing cars benefits gang members because they can use them to commit crimes or sell them to a "chop shop," and most drive-by shootings are done in stolen cars.

*Defense Case*

Defendant testified that he did not know Andrade, was not at her party, did not steal her car keys or the Chrysler, never drove the Chrysler, was not driving on December 25, 2010, and did not know anything about the gun in the car.

Defendant told the jury he spent Christmas Day at his friend Christopher's house. At around 11:30 p.m., he and Christopher decided to go to Closter Park, which is two to

12

three blocks from the area where the police contacted him, to smoke marijuana. Christopher waited at the park while defendant walked down Bellehaven Street to a market on Williams Road to buy some rolling papers. Defendant testified that the CHP officers stopped him at First Avenue and Bellehaven Street, a block away from Saint Joseph Circle, and asked if he had been in a car. He did not know what car they were talking about and did not see a car other than the patrol car. Defendant testified that he was never on Saint Joseph Circle that night.

Defendant told the officers he was 18 years old. He said he was not on probation or parole and told the officers they did not have the right to search him. The officers patsearched him, put him in handcuffs, emptied his pockets, and found marijuana. Defendant did not have any keys and denied discarding the Chrysler keys.

Defendant admitted he gave the officers a false name. He said he was on probation and did not want to go to juvenile hall on Christmas. Defendant admitted that he lied to Officer Lopez when he said he was not on probation and gave him false names and dates of birth. He admitted that he gave the jail deputy a false name in December 2010 and that he gave the police a false name in January 2010.

Defendant testified that he is not a Norteño gang member and said he "hangs out" with Norteños because he went to school with them. Defendant denied telling the jail deputy he was a Norteño gang member; he told him he hangs out with Norteños. He also testified that the deputy filled out the form and did not give defendant a chance to fill it out. Defendant testified that he asked the deputy to put him in the general population dorm. Upon entering the K-5 pod, he was not asked any questions by the inmates to determine if he was a Norteño gang member or associate. The only thing the inmates did was search him. Defendant testified that he got along well in the Norteño dorm because he sticks to himself.

Defendant denied fighting with a gang rival at school; he said he used to be friends with "that guy" and was suspended from school over the incident. Defendant testified

13

that he went to juvenile hall because someone accused him of stealing money to benefit a gang. Defendant said he just asked to borrow $1 so he could buy some ice cream. At juvenile hall, they asked him repeatedly, for hours and hours, whether he was a Norteño or a Sureño. He said nothing, but they told him he had to pick one, so he said he was a Norteño because "those are the people [he] grew up with." On cross-examination, he admitted that he was on juvenile probation for grand theft and dissuading a witness.

Defendant denied admitting he was a Norteño in 2009. At that time, he lived on Santa Rita Road. The police pulled him over for not wearing a bicycle helmet, "hassled" him, and accused him of being a Santa Rita Boy, when he was not a gang member. Defendant testified that the gang clothing the police found in his apartment was his father's San Francisco 49ers jersey.

Defendant said he got the "Salas" tattoo when he was 16 or 17. It means "Salinas" and he got it because he grew up in Salinas. Defendant testified that it is not a badge of honor for Norteños and anyone "could get it. Southsiders get 'em, too." Defendant's evidence included the black White Sox baseball cap he was carrying when Officer Lopez stopped him. There was no writing on the bill of that cap.

## PROCEDURAL HISTORY

The case was tried to a jury. The jury convicted defendant of carrying a loaded firearm in a vehicle (§ 12031, subd. (a)(1); count 1), vehicle theft (Veh. Code, § 10851, subd. (a); count 3), and street terrorism (§ 186.22, subd. (a); count 4). The jury found true enhancement allegations that defendant was not the registered owner of the gun (§ 12031, subd (a)(2)(F); count 1) and that he carried the loaded gun and committed the vehicle theft for the benefit of a criminal street gang (§ 186.22, subd. (b); counts 1 and 3). The jury was unable to reach a verdict on the allegation that defendant carried a concealed firearm in a vehicle (§ 12025, subd. (a)(3); count 2) and the court declared a mistrial as to that count. (We shall hereafter refer to this case as the "auto theft case" as

14

opposed to the "prowling case" that occurred in August 2011 and which is described below.)

According to the probation report, defendant had a history of juvenile adjudications. He was declared a ward of the court in May 2008 (at age 15) and spent 30 days in juvenile hall for grand theft and dissuading a witness. He violated his probation seven times and spent 205 additional days in juvenile hall because of those violations. One of his violations was for brandishing a firearm at school. Defendant had successfully completed the Second Chance program and was on a waiting list for tattoo removal services when he was arrested in the auto theft case. He had some work experience. Although he went to school through the 12th grade, he did not graduate from high school. He told the probation officer he was going to give up a life of crime, go back to school, and move out of state because he did not want to spend any more time in an adult jail. Since defendant had never been supervised as an adult, the probation department recommended the court suspend imposition of sentence and grant probation, with a high level of supervision and gang restrictions.

In June 2011, the court suspended imposition of sentence and granted probation, with conditions, including that defendant serve 266 days in jail with credit for 266 days (178 actual days plus conduct credits equal to 88 days). The conditions of probation included gang terms. The court ordered defendant to pay a restitution fine of $600 ($200 for each felony; § 1202.4) and imposed, but suspended, a probation revocation restitution fine of $600 (§ 1202.44). The court imposed other fines and fees, including a court security fee (§ 1465.8, subd. (a)(1)) of $120 (the number of convictions (three) times $40) and a court facilities assessment (Gov. Code, § 70373) of $90 (the number of convictions (three) times $30).

In August 2011, less than two months after sentencing, defendant was arrested for and charged with two new felonies: possession of burglary tools (§ 466) and prowling (§ 647, subd. (h)). (We shall hereafter refer to this case as the "prowling case.") The

15

complaint in the prowling case contained enhancement allegations that both offenses were committed for the benefit of the Norteño criminal street gang (§ 186.22, subd. (b)) and that defendant had three prior convictions for serious felonies for the purpose of the Three Strikes Law (§ 1170.12). Defendant was also charged with a violation of probation and his probation was revoked.

Pursuant to a negotiated plea in the prowling case, defendant's new offenses were reduced to misdemeanors (§ 17, subd. (b)). Defendant pleaded no contest to both counts and admitted one of the strike prior allegations in exchange for a nine-year prison sentence in the auto theft case. The other enhancement allegations were dismissed. Based on his plea in the prowling case, the court also found defendant in violation of his probation in the auto theft case.

In October 2011, the court sentenced defendant in both cases. In the auto theft case, the court imposed the upper term of three years for the vehicle theft (Veh. Code, § 10851, subd. (a)) plus the upper term of four years for the gang enhancement (§ 186.22, subd. (b)(1)), for a total of seven years for the vehicle theft (count 3). The court sentenced defendant to eight months consecutive (one third the middle term) for carrying a loaded firearm in a vehicle (§ 12031, subd. (a)(1)), plus one year four months (one third the upper term) consecutive for the gang enhancement (§ 186.22, subd. (b)) on that count, for a total of 2 consecutive years for the firearm offense (count 1). On the street terrorism count (§ 186.22, subd. (a); count 4), the court sentenced defendant to the middle term of two years and stayed that sentence pursuant to section 654. The court imposed a restitution fine (§ 1202.4, subd. (b)) of $5,400 ($200 times the number of counts (three) times the number of years (nine) equals $5,400) and imposed, but suspended, a parole revocation restitution fine in the same amount (§ 1202.45). The court imposed other fines and fees, including a court security fee (§ 1465.8, subd. (a)(1)) of $120 (the number of convictions (three) times $40) and a court facilities assessment (Gov. Code, § 70373) of $90 (the number of convictions (three) times $30).

16

In the prowling case, the court denied probation and sentenced defendant to 79 days in jail with credit for 79 days (53 actual days plus conduct credits equal to 26 days). The court also imposed fines and fees that are not at issue on appeal.

## DISCUSSION

Defendant raises five issues on appeal, all of which arise out of the auto theft case. First, based on the Supreme Court's holding in *Rodriguez*, *supra*, 55 Cal.4th 1125 that a person who acts alone cannot be convicted of street terrorism, defendant contends that his conviction for street terrorism (§ 186.22, subd. (a)) must be reversed since there was no evidence that he acted with other gang members. The Attorney General concedes this issue. Second, defendant contends that the holding in *Rodriguez* also applies to gang enhancements (§ 186.22, subd. (b)(1)) and that the true findings on the gang enhancements on the vehicle theft and carrying a loaded firearm in a vehicle convictions (counts 1 and 3) must be reversed because there was no evidence that he committed those offenses with other gang members. The Attorney General disputes this claim. Third, defendant argues that even if *Rodriguez* does not apply to the gang enhancements, reversal is required because the only evidence supporting the enhancements was the conclusory opinion of the gang expert. The Attorney General also contests this claim. Fourth, defendant argues that even if there was sufficient evidence to support his conviction for street terrorism and the true findings on the gang enhancements, this court should remand this case back to the trial court because of instructional error related to the street terrorism count (§ 186.22, subd. (a)) and the gang enhancements (§ 186.22, subd. (b)(1)). The Attorney General argues that defendant has forfeited this claim and that, even if he had preserved the issue, the jury instructions were proper. Fifth, defendant contends that the court erred in October 2011 when it imposed the $5,400 restitution fine (§ 1202.4), the $90 court facilities assessment (Gov. Code, § 70373), and the $120 court security fee (§ 1465.8, subd. (a)(1)). The Attorney General concedes that there is error

17

related to those fines and fees.  Before discussing each of defendant's claims, we review pertinent information about the law applicable to criminal street gangs.

## I.  Section 186.22--the STEP Act

Section 186.22 is part of "the California Street Terrorism Enforcement and Prevention Act (the STEP Act) (§ 186.20 et seq.), involving the activity of criminal street gangs." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1128.)  "Underlying the STEP Act was the Legislature's recognition that 'California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods.' (Pen.Code, § 186.21.)  The act's express purpose was 'to seek the eradication of criminal activity by street gangs.' (*Ibid.*)" (*Gardeley*, *supra*, 14 Cal.4th at p. 609.)  "In pursuit of this goal, the STEP Act focuses upon 'patterns of criminal gang activity and upon the organized nature of street gangs, which together, are the chief source of terror created by street gangs.' " (*Rodriguez*, at p. 1129, quoting § 186.21.)

In addressing the problem, the STEP Act created a substantive offense, set forth in section 186.22, subdivision (a), and a sentencing enhancement, set forth in subdivision (b) of the statute.  The parties and the court below referred to the substantive offense as "street terrorism," while the *Rodriguez* court referred to it as "the gang participation offense." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1128, fn. 2.)  We shall hereafter follow *Rodriguez* and refer to the substantive crime under section 186.22, subdivision (a) as the "the gang participation offense" or "gang participation."  We shall also adopt the shorthand references used in *Rodriguez* and shall hereafter refer to section 186.22, subdivision (a) as "section 186.22(a)" and section 186.22, subdivision (b)(1) as "section 186.22(b)(1)." (*Rodriguez*, *supra*, 55 Cal.4th at pp. 1128, 1129.)

18

***II. Since Defendant Acted Alone, There is Insufficient Evidence to Support His Conviction for Violating Section 186.22, Subdivision (a)***

Section 186.22(a) provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished . . . ."

The elements of the gang participation offense (§ 186.22(a)) are: (1) active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang. (*People v. Lamas* (2007) 42 Cal.4th 516, 523.) "A person who is not a member of a gang, but who actively participates in the gang, can be guilty of violating section 186.22(a). [Citations.] The offense is punishable as a felony with a state prison term of 16 months, two years, or three years, or as a misdemeanor. (§ 186.22(a).) [¶] Mere active and knowing participation in a criminal street gang is not a crime." (*Rodriguez*, *supra*, 55 Cal.4th at p. 1130, footnote omitted.)

In *Rodriguez*, the Supreme Court addressed the question whether the third element of the gang participation offense (the willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang) is satisfied when a gang member commits a felony while acting alone. (*Rodriguez*, *supra*, 55 Cal.4th at p. 1131.) The defendant in *Rodriguez* was a Norteño gang member who committed an attempted robbery. There was no evidence that he "acted with anyone else." (*Id*. at pp. 1128-1129.) He was convicted by jury of attempted robbery and the gang participation offense (§ 186.22(a)). (*Rodriguez*, at p. 1129.) The Supreme Court held that a gang member does not violate section 186.22(a) if he or she "commits a felony, but acts alone." (*Id*. at pp. 1128, 1132.) The court found it "significant that the offense requires a defendant to

19

promote, further, or assist *members* of the gang." (*Id*. at p. 1131, italics in original.) Based on the plain meaning of the plural noun "members," the court held that section 186.22(a) "requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he [or she] is a gang member." (*Rodriguez,* at p. 1132.)

Defendant contends that under *Rodriguez*, his gang participation conviction must be reversed because there was no evidence that he stole the car or possessed the loaded firearm in concert with other gang members. The Attorney General concedes that there was insufficient evidence to support defendant's conviction for gang participation (§ 186.22(a)). As we shall explain, we will accept the Attorney General's concession.

To assess the sufficiency of the evidence, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. (*People v. Maury* (2003) 30 Cal.4th 342, 403 (*Maury*); *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) The record must disclose substantial evidence to support the verdict and findings-i.e., evidence that is reasonable, credible, and of solid value; evidence that reasonably inspires confidence - such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Maury,* at p. 396; *People v. Marshall* (1997) 15 Cal.4th 1, 33.) When applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. (*People v. Boyer* (2006) 38 Cal.4th 412, 480.)

Officer Lopez testified that defendant was by himself when he saw him driving the Chrysler and when he exited the car at 6 Saint Joseph Circle. Although defendant initially told the officers his girlfriend was driving the car, Officer Lopez did not see a woman or anyone other than defendant in the car. Magana's testimony also refuted that story. Moreover, there was no evidence that defendant's girlfriend was a gang member. And there was no evidence that defendant was with other gang members when he stole

20

the Chrysler or that other gang members exercised joint possession and control over the loaded handgun that was in the car.[7]  For these reasons, we accept the Attorney General's concession and hold that there was insufficient evidence to support defendant's conviction for gang participation (§ 186.22(a)) because there was no evidence he committed his offenses with one or more gang members.  We will therefore order the court to strike the gang participation conviction (§ 186.22(a); count 4).

### III.  *Rodriguez Does Not Preclude Gang Enhancements Under Section 186.22(b)(1)*

Defendant argues that the holding in *Rodriguez* applies to gang enhancements imposed pursuant to section 186.22(b)(1) and that the true findings on the gang enhancements on his vehicle theft and gun possession convictions must be reversed because there is no evidence that he committed those offenses with one or more gang members.  The Attorney General does not address the legal question whether a lone actor may be subject to the section 186.22(b)(1) gang enhancement.

This is a question of law involving the interpretation of a statute, which we review de novo.  (*People v. Cromer* (2001) 24 Cal.4th 889, 893-894.)

Section 186.22(b)(1) provides in relevant part:  "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and

---

[7]  We note that there were three hats in the car:  the black beanie with gang indicia on it, the Raiders baseball cap with gang writing on it, and the White Sox baseball cap with no gang writing on it.  While this evidence suggests that two other individuals may have been in the car with defendant at one time, and that two of those three persons may have been gang members, an equally reasonable inference is that all three hats belonged to defendant, particularly since one of the hats was found in the trunk of the car.

21

consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows . . . ."

There are two "prongs" to the enhancement. (*People v. Albillar* (2010) 51 Cal.4th 47, 59 (*Albillar*).) First, the prosecution is required to prove that the underlying felonies were "committed for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22(b)(1).) Second, there must be evidence that the crimes were committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22(b)(1); *Albillar*, at p. 59.)

In *Rodriguez*, the court observed that there are several differences between the gang participation offense (§ 186.22(a)) and the gang enhancement (§ 186.22(b)(1)). The court explained, "Section 186.22(a) and section 186.22(b)(1) strike at different things. The enhancement under section 186.22(b)(1) punishes gang-related conduct, i.e., felonies committed with the specific intent to benefit, further, or promote the gang. [Citation.] However, '[n]ot every crime committed by gang members is related to a gang.' [Citation.] As such, with section 186.22(a), the Legislature sought to punish gang members who acted *in concert* with other gang members in committing a felony regardless of whether such felony was gang-related. (*Albillar, supra,* [51 Cal.4th] at p. 55 ['there is nothing absurd in targeting the scourge of gang members committing any crimes together and not merely those that are gang related' (italics omitted)].)" (*Rodriguez, supra*, 55 Cal.4th at p. 1138.) The court went on to observe that "[u]nlike the substantive offense, the enhancement does not require proof of participation in a gang. It is further distinguished from the substantive offense by applying only to gang-related offenses and by requiring the defendant to act with the specific intent to promote, further, or assist any criminal conduct by gang members." (*Id.* at p. 1130, fn. 5.) While the gang enhancement (§ 186.22(b)(1)) applies only to gang-related offenses, the gang participation offense (§ 186.22(a)) does not require that the underlying felony be gang related, but does require that the defendant "act with another gang member." (*Id.* at p.

22

1135.)  And unlike the gang enhancement (§ 186.22(b)(1)), the gang participation offense (§ 186.22(a)) "does not require a specific intent to further or promote the gang (only knowledge of the gang's pattern of criminal activity)."  (*Rodriguez*, at pp. 1134-1135.)

Defendant argues that the statutory language at issue in *Rodriguez* (the requirement that the defendant "willfully promote[], further[], or assist[] in any felonious criminal conduct by members of that gang" (§ 186.22(a)) is "nearly identical" to the second prong of the enhancement, which provides that the defendant must act "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22(b)(1).  Defendant acknowledges the differences between subdivisions (a) and (b)(1) of section 186.22, but argues "Nonetheless, based on *Rodriguez*, the specific intent requirement of the gang enhancement should be read similarly as the phrase in the [gang participation offense, namely] that the defendant must act with the specific intent to promote, further, or assist in any criminal conduct done *collectively* with other gang members."  The fact that the gang participation offense (§ 186.22(a)) does not contain a specific intent requirement undercuts defendant's contention that "the specific intent requirement of the gang enhancement should be read similarly [to] the comparable provision" in section 186.22(a).

Pertinent to this issue, the lead opinion in *Rodriguez*[8] stated, "A lone gang member who commits a felony will not go unpunished; he or she will be convicted of the

_____

[8] As defendant notes, *Rodriguez* is a plurality decision.  The lead opinion, authored by Justice Corrigan (joined by Justices Werdegar and Liu), is based upon a plain language interpretation of section 186.22(a) and due process concerns that "might be raised by punishing mere gang membership."  (*Rodriguez*, *supra*, 55 Cal.4th at p. 1133.)  Justice Baxter agreed with the lead opinion's plain language analysis, but concluded that "there is no need to consider the constitutional implications of a contrary construction." (*Id.* at pp. 1139-1140.)  Justice Kennard (joined by Chief Justice Cantil-Sakauye and Justice Chin) dissented; in their view, a gang member acting alone may be guilty of violating section 186.22(a).  (*Rodriguez,* at pp. 1141-1147.)

underlying felony. Further, such a gang member would not be protected from having that felony enhanced by section 186.22(b)(1), which applies to 'any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .' Because the gang enhancement . . . requires both that the felony be gang related and that the defendant act with a specific intent to promote, further, or assist the gang, these requirements provide a nexus to gang activity sufficient to alleviate due process concerns. [Citation.] Furthermore, we note that the lone perpetrator's punishment under the sentencing enhancement would be more substantial than that imposed for a defendant who violates section 186.22(a)." (*Rodriguez, supra*, 55 Cal.4th at pp. 1138-1139.)

Defendant discounts these statements, arguing that they are dicta and do not represent the opinion of a majority of the court since Justice Baxter did not agree that it was necessary to address due process concerns in analyzing section 186.22(a). But the lead opinion in *Rodriguez* relies on both the plain language of the section 186.22(b)(1) enhancement and due process considerations. Further, defendant's argument ignores Justice Baxter's plain language analysis of whether the section 186.22(b)(1) enhancement applies to lone actors. Since Justice Baxter agreed with the lead opinion's statement that lone actors are subject to the gang enhancement in section 186.22(b)(1), that view, although dicta, was held by a majority of the court. (*Rodriguez, supra*, 55 Cal.4th at pp. 1140-1141.)

In his concurrence, Justice Baxter acknowledged that "a seemingly similar reference to gang 'members' appears in both section 186.22(a) and section 186.22(b)(1)," but concluded that "small but significant differences in grammar and context make clear that the enhancement provision lacks the same multiple-actor condition as the gang offense." (*Rodriguez, supra*, 55 Cal.4th at p. 1140.) Justice Baxter stated, "First, section 186.22(b)(1), unlike section 186.22(a), applies where the defendant, even if acting alone,

24

'specific[ally] inten[ds]' by his felonious action to promote, further, or assist in any criminal conduct by gang members.  Section 186.22(b)(1)'s reference to promoting, furthering, or assisting gang members thus merely describes a culpable mental state.  By contrast, the gravamen of section 186.22(a) is that the defendant's own criminal conduct must itself directly promote, further, or assist felonious criminal conduct by members of the gang.  Thus, section 186.22(a) implies joint criminal action with other gang members- an implication that does not necessarily arise in section 186.22(b)(1).  This difference suggests we need not construe gang 'members' in each provision the same way.  [¶]  The relevant two subdivisions also treat criminal conduct by gang 'members' differently.  As noted, section 186.22(a) plainly requires felonious criminal conduct committed in tandem by at least two gang members, one of whom may be the defendant.  In contrast, nothing in section 186.22(b)(1) states or implies that the criminal conduct by gang members which the defendant intends to promote, further, or assist is the same criminal conduct underlying the felony conviction subject to enhancement.  For this reason too, the direct and specific link between criminal conduct committed by the defendant and that committed by other gang members set forth in the gang offense (§ 186.22(a)) is not present in the gang enhancement (§ 186.22(b)(1))." (*Rodriguez*, at pp. 1140-1141.)

Even though the court's comments on section 186.22(b)(1) in *Rodriguez* are dicta, Supreme Court dicta generally should be followed, particularly where the comments reflect the court's considered reasoning.  (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169 ["When the Supreme Court has conducted a thorough analysis of the issues and such analysis reflects compelling logic, its dictum should be followed"].)  The *Rodriguez* plurality relied on the availability of the sentencing enhancement as reassurance that its interpretation of section 186.22(a) would not leave lone gang members who commit gang-related felonies inadequately punished.  (*Rodriguez*, *supra*, 55 Cal.4th at pp. 1138-1140.)  Since the court's statements in dicta were not "inadvertent, ill-considered or a matter lightly to be discarded" we consider them in our analysis.

25

(*Jaramillo v. State of California* (1978) 81 Cal.App.3d 968, 971.)  In addition, we find Justice Baxter's interpretation of section 186.22(b)(1) persuasive.  For these reasons, we follow the dicta in *Rodriguez* and hold that the section 186.22(b)(1) gang enhancement may be applied to a lone actor.

## IV.  *Sufficiency of the Evidence to Support the Gang Enhancement*

Defendant contends that even if the holding in *Rodriguez* does not apply to the gang enhancements to counts 1 and 3, the true findings on the enhancements must be reversed because the only evidence supporting them was the conclusory opinion of the prosecution's gang expert.

As we have stated, the relevant question under the substantial evidence standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)  "[The] appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*People v. Reilly* (1970) 3 Cal.3d 421, 425; accord *People v. Pensinger* (1991) 52 Cal.3d 1210, 1237.)  "A reasonable inference, however, 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.  [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.'"  (*People v. Morris* (1988) 46 Cal.3d 1, 21, overruled on another ground as stated in *In re Sassounian* (1995) 9 Cal.4th 535, 543, 545, fns. 5, 6.)  A trier of fact may rely on inferences to support a conviction only if those inferences are "of such substantiality that a reasonable trier of fact could determine beyond a reasonable doubt" that the inferred facts are true.  (*People v. Raley* (1992) 2 Cal.4th 870, 890-891.)

26

To subject a defendant to a gang enhancement (§ 186.22(b)(1)), the prosecution must prove that the underlying crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang" (the gang-related prong), "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (the specific intent prong). (§ 186.22, subd. (b)(1); *Albillar*, *supra*, 51 Cal.4th at pp. 59-60.)[9] Defendant's sufficiency of the evidence challenge does not distinguish between these two prongs. Instead, he lumps them together, referring to them as the "gang-related" element.[10] This approach does not aid our analysis.

Defendant begins by citing the rule from *Albillar* that "[n]ot every crime committed by gang members is related to a gang." (*Albillar*, *supra*, 51 Cal.4th at p. 60.)

_____

[9] "In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a 'pattern of criminal gang activity' by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called 'predicate offenses') during the statutorily defined period. (§ 186.22, subds. (e) and (f).)" (*Gardeley*, *supra*, 14 Cal.4th at pp. 616-617.) Defendant focuses on the gang-related and specific intent prongs of the gang enhancement; he does not challenge the sufficiency of the evidence to support the other elements set forth in *Gardeley*. Defendant states that "there is little doubt that [he] was at least associated with the Norte[ñ]o criminal street gang due to his prior contacts with law enforcement and the indicia found on his phone." Defendant argues that while there were sufficient independent facts to support the gang expert's opinion regarding his gang membership, there was insufficient evidence to support the expert's conclusion that his crimes were gang-related.

[10] Defendant asserts: "Though the two elements of the gang enhancement are distinct, courts analyzing the sufficiency of the evidence often do not substantially distinguish between them, effectively considering more generally whether the offense was sufficiently gang-related." Defendant cites *People v. Ramon* (2009) 175 Cal.App.4th 843, 849-853 (*Ramon*) and argues that after setting forth the elements of the gang enhancement, the *Ramon* court analyzed the case "without further distinguishing between the elements." We disagree. The defendant in *Ramon* challenged the sufficiency of the evidence to support both prongs of the gang enhancement (§ 186.22(b)(1)) and the court's analysis mentions both, albeit not under separate headings. (*Id.* at pp. 850-853.)

27

Citing *In Re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*) and *Ramon*, *supra*, 175 Cal.App.4th 843 defendant argues that a gang expert's testimony is insufficient to support the section 186.22(b)(1) gang enhancement "when the testimony is based only on the expert's opinion and is not coupled with sufficient supporting evidence relating to the specific offense itself."

*Frank S.* concerned the sufficiency of the evidence to support both prongs of a gang enhancement (§ 186.22(b)(1)). The minor in that case was stopped by police after he ran a red light on his bicycle. He gave a false name, and the officer found a concealed knife, a bindle of methamphetamine, and a red bandana in his possession. (*Frank S.*, *supra*, 141 Cal.App.4th at p. 1195.) The minor said he was attacked two days earlier and "needed the knife for protection against 'the Southerners' because they feel he supports northern street gangs." (*Ibid.*) The minor said he had friends in the northern gangs and listed himself as a Norteño affiliate during intake at the juvenile detention facility. (*Ibid.*) A gang expert opined that, based on this evidence, the minor was an active Norteño and his possession of the knife benefitted the Norteños because "it helps provide them protection should they be assaulted." (*Id*. at pp. 1195-1196.)

The appellate court reversed the true finding on the gang enhancement (§ 186.22(b)(1)), stating: "In the present case, the expert simply informed the judge of her belief of the minor's intent with possession of the knife, an issue reserved to the trier of fact. She stated the knife benefits the Norteños since 'it helps provide them protection should they be assaulted by rival gang members.' However, unlike in other cases, the prosecution presented no evidence other than the expert's opinion regarding gangs in general and the expert's improper opinion on the ultimate issue to establish that possession of the weapon was 'committed for the benefit of, at the direction of, or in association with any criminal street gang . . . .' [Citation.] The prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense. In fact, the only

28

other evidence was the minor's statement to the arresting officer that he had been jumped two days prior and needed the knife for protection. To allow the expert to state the minor's specific intent for the knife without any other substantial evidence opens the door for prosecutors to enhance many felonies as gang-related and extends the purpose of the statute beyond what the Legislature intended." (*Frank S.*, *supra*, 141 Cal.App.4th at p. 1199.) The court added, "While evidence established the minor has an affiliation with the Norteños, membership alone does not prove a specific intent to use the knife to promote, further, or assist in criminal conduct by gang members." (*Ibid.*)

*Ramon*, the other case cited by defendant, concerned the sufficiency of the evidence to support the specific intent prong of gang enhancement (§ 186.22(b)(1)) allegations. The defendant in *Ramon*, a gang member, was stopped by police in his gang's territory while driving a stolen truck. A fellow gang member was in the truck, and police found an unregistered firearm under the driver's seat. (*Ramon*, *supra*, 175 Cal.App.4th at pp. 846-847, 849.) The defendant was convicted by jury of three firearm offenses and receiving a stolen vehicle; the jury also found true gang enhancement allegations on three counts. (*Id.* at p. 848.) At trial, a gang expert testified that the stolen truck and the unregistered firearm could be used to commit gang crimes. (*Id.* at p. 847.) He opined that possessing a gun and driving a stolen truck in gang territory benefitted the gang and that the perpetrators of these offenses would intend to promote the gang. (*Id.* at p. 848.) The expert testified that stolen trucks and firearms were "tools" that the gang needed to commit other crimes. (*Ibid.*)

On appeal, the defendant in *Ramon* argued that the facts of his offenses plus the fact of his gang membership and presence in gang territory were insufficient to support the expert's opinion on benefit and intent. (*Ramon, supra,* 175 Cal.App.4th at pp. 849-851.) The appellate court agreed, stating, "The People's expert simply informed the jury of how he felt the case should be resolved. This was an improper opinion and could not provide substantial evidence to support the jury's finding. There were no facts from

29

which the expert could discern whether Ramon and Martinez were acting on their own behalf the night they were arrested or were acting on behalf of [their gang]. While it is possible the two were acting for the benefit of the gang, a mere possibility is nothing more than speculation. Speculation is not substantial evidence." (*Id.* at p. 851.) The court also held that the "facts on which [the gang expert] based his testimony were insufficient to permit him to construct an opinion about Ramon's specific intent . . . . ." (*Id.* at p. 852.) The court reasoned that "[w]hile the People's expert's opinion certainly was one possibility, it was not the only possibility. And, . . . , a mere possibility is not sufficient to support a verdict." (*Id.* at p. 853.) The court stated, "The analysis might be different if the expert's opinion had included 'possessing stolen vehicles' as one of the activities of the gang. . . . [¶] Simply put, in order to sustain the People's position, we would have to hold as a matter of law that two gang members in possession of illegal or stolen property in gang territory are acting to promote a criminal street gang. Such a holding would convert section 186.22(b)(1) into a general intent crime. The statute does not allow that. [Citations.]" (*Ramon*, at p. 853.)

Defendant also cites *People v. Muniz* (1993) 16 Cal.App.4th 1083 (*Muniz*), but does so as "an example of a case where the evidence supporting the gang enhancement was sufficient." Defendant describes *Frank S.* and *Muniz* as "relevant guideposts in determining when an expert's conclusions are based on sufficient evidence to support a gang enhancement." In *Muniz*, Deputy Corrigan, one of the investigating officers, opined that the defendant, a known gang member, was preparing to commit a drive-by shooting when other officers observed him holding a loaded semiautomatic rifle in an illegally parked car with three other known gang members. Deputy Corrigan's opinion was based on facts observed by the other officers, his own experience with gang investigations, and the defendant's admission, in an interview with Deputy Corrigan, that he was on his way to rival gang territory to do a retaliatory drive-by shooting. (*Muniz*, at pp. 1085-1086.) Contrary to defendant's assertion, *Muniz* did not involve a gang enhancement (§

30

186.22(b)(1)) or address the sufficiency of the evidence to support gang enhancement allegations. (*Id.* at p. 1085-1088.) The issue in that case was the sufficiency of the evidence to support the defendant's conviction of conspiracy to commit an assault with a firearm. But *Muniz* does contain the type of evidence that might support the specific intent prong of a gang enhancement; namely, the defendant's admissions that he was a gang member and that he and a fellow gang member were on their way to rival gang territory "to do a drive by shooting 'to pay them back' for recent shootings and the death of one of their 'home boys.' " (*Id.* at p. 1086.)

In reviewing defendant's contentions, we note as to the specific intent prong that "[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.) "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.)

Although not cited by either party, *People v. Ochoa* (2009) 179 Cal.App.4th 650, 652 (*Ochoa*) is instructive. The defendant in *Ochoa* challenged the sufficiency of the evidence to support the gang-related prong of gang enhancement allegations (§ 186.22(b)(1)) attached to carjacking and felon in possession of a firearm counts. The defendant, a gang member, acted alone in committing a carjacking with a shotgun and the offense did not occur in his gang's territory (*Ochoa*, at pp. 653, 662.) A divided appellate court found the evidence insufficient to sustain the gang-related prong of the gang enhancements (§ 186.22(b)(1)). "[N]othing in the circumstances of the instant offenses sustain[s] the expert witness's inference that they were gang related." (*Id.* at pp. 661-662.)

Citing *Frank S.*, the *Ochoa* court explained, "There was no evidence that only gang members committed carjackings or that a gang member could not commit a carjacking for personal benefit, rather than for the benefit of the gang. Indeed, two of the

31

People's witnesses testified that gang members can commit crimes on their own without benefitting the gang. While the sergeant effectively testified that carjacking by a gang member would always be for the benefit of the gang, this ' "did nothing more than [improperly] inform the jury how [the expert] believed the case should be decided," ' without any underlying factual basis to support it." (*Ochoa*, *supra*, 179 Cal.App.4th at p. 662.) The court stated, "[The d]efendant did not call out a gang name, display gang signs, wear gang clothing, or engage in gang graffiti while committing the instant offenses. There was no evidence of bragging or graffiti to take credit for the crimes. There was no testimony that the victim saw any of [the] defendant's tattoos. There was no evidence the crimes were committed in [the defendant's] gang territory or the territory of any of its rivals. There was no evidence that the victim of the crimes was a gang member or a . . . rival. [The d]efendant did not tell anyone, as the defendant did in *Ferraez*, that he had special gang permission to commit the carjacking. ([*People v. Ferraez* (2003)] 112 Cal.App.4th [925,] 928.) [The d]efendant was not accompanied by a fellow gang member. [¶] While the sergeant testified that the carjacking could benefit the defendant's gang in a number of ways, he had no specific evidentiary support for drawing such inferences. Indeed, he admitted that there was no indication that [the] defendant had used the vehicle to transport other gang members. There was no testimony that [the] defendant used the vehicle to transport drugs or manifested any intention to do so. While the sergeant testified that [the] defendant may have been motivated to commit the instant crimes in order to exact retaliation against another individual, he failed to provide any evidentiary support for this conclusion. There was never any suggestion that the alleged victim of the brandishing charge was a rival gang member or had committed any offenses against [the] defendant or his gang. The sergeant's testimony, as to how

32

[the] defendant's crimes would benefit [his gang], was based solely on speculation, not evidence." (*Id.* at pp. 662-663.)[11]

In reviewing defendant's contentions, we consider two Supreme Court cases that were decided after the cases summarized above: *Albillar* and *People v. Vang* (2011) 52 Cal.4th 1038 (*Vang*). In *Albillar*, three fellow gang members were convicted of forcible rape in concert, forcible sexual penetration in concert, and the gang participation offense (§ 186.22(a)). The jury also found true gang enhancement allegations (§ 186.22(b)(1)) on the sex offenses. (*Albillar*, *supra*, 51 Cal.4th at p. 50.) The issues on appeal included whether there was sufficient evidence to support the jury's findings on both prongs of the gang enhancements. (*Id*. at pp. 63-68.) Aside from the victim's testimony that the defendants cooperated with one another to commit the offenses and evidence that persons affiliated with the defendants threatened to harm the victim and her family if they reported the crimes to the police, the remaining evidence came from the gang expert. (*Id.* at pp. 52-54.)

On the gang-related prong of the section 186.22(b)(1) enhancement, the gang expert in *Albillar* testified that " '[w]hen three gang members go out and commit a violent brutal attack on a victim' " that elevates their individual status and reputation and that " 'the overall entity benefits and strengthens as a result of it' " and that reports of such conduct raise the " 'level of fear and intimidation in the community.' " (*Albillar, supra,* 51 Cal.4th at p. 63.) The gang expert "applied his analysis to a hypothetical based on the facts of the crime . . . , where the victim knew that at least two of her assailants were members of [the] Southside Chiques" gang and opined that it was " '[m]ore than likely' " this crime was reported not as three individuals committing a rape, but members

[11] The court in *Ochoa*, however, disagreed with the *Ramon* court's assessment of the evidence in *Ramon* and said that it would have found that evidence sufficient to support the specific intent prong. (*Ochoa*, *supra*, 179 Cal.App.4th at p. 661, fn. 6.)

of the gang committing a rape, which elevates the gang's " 'reputation to be a violent, aggressive gang that stops at nothing and does not care for anyone's humanity.' " (*Id.* at p. 63.) The Supreme Court held that "[e]xpert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)." (*Albillar*, at p. 63.)

As for the specific intent prong of the enhancement (§ 186.22(b)(1)), the court held that "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members. [In *Albillar*], there was ample evidence that [the] defendants intended to attack [the victim], that they assisted each other in raping her, and that they were each members of the criminal street gang. Accordingly, there was substantial evidence that defendants acted with the specific intent to promote, further, or assist gang members in that criminal conduct." (*Albillar*, *supra*, 51 Cal.4th at p. 68.)

The most recent Supreme Court case to discuss gang expert evidence is *Vang*. The four defendants in *Vang*, three of whom admitted membership in a criminal street gang, were convicted by jury of assault by means of force likely to produce great bodily injury after they attacked an individual who at one time associated with the gang. The jury also found true gang enhancement allegations (§ 186.22(b)(1)). (*Vang, supra*, 52 Cal.4th at p. 1041.) At trial, the prosecution's gang expert responded to two hypothetical questions that closely tracked the evidence in the case. After stating the hypothetical facts, the prosecutor asked the expert if he had an opinion (1) whether the assault was committed for the benefit of, at the direction of, or in association with the gang; and (2) whether the attack was "gang-motivated" (an apparent shorthand reference to the "specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22(b)(1)). The expert opined that they were. (*Id.* at p. 1043.) The expert based

34

his opinion that the assaults were "gang-motivated" on evidence that (1) the victim had at one time associated with gang members, (2) the victim was lured from his garage to the spot where the attack occurred, and (3) the attack " 'was done in concert with known documented gang members' " who worked together to attack the victim. (*Id.* at p. 1043.) On appeal, the defendants argued that the trial court erred when it allowed the expert to testify in response to a "thinly disguised" hypothetical that the attack was committed for the benefit of the gang and was gang motivated. (*Id.* at p. 1044.) The Supreme Court disagreed and held that an expert may "express an opinion, based on hypothetical questions that tracked the evidence, whether the [crime], if the jury found it in fact occurred, would have been for a gang purpose." (*Id.* at p. 1048.) "It is required, not prohibited, that hypothetical questions be based on the evidence. The questioner is not required to disguise the fact the questions are based on that evidence." (*Id.* at p. 1041.) Quoting *Albillar*, the court reiterated its view that " '[e]xpert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . gang enhancement." (*Id.* at p. 1048, quoting *Albillar*, *supra*, 51 Cal.4th at p. 63.)

Finally, *In re Daniel C.* (2011) 195 Cal.App.4th 1350 (*Daniel C.*) addressed the sufficiency of the evidence to support the specific intent prong of a gang enhancement (§ 186.22(b)(1)). The minor in that case entered a supermarket with two other young men. After the minor's companions left the store, the minor took a bottle of whiskey and left without paying for it. When a store employee confronted him, the minor raised the bottle and the bottle broke on a nearby machine. The minor hit the employee with the broken bottle, injuring him, and ran out of the store. (*Id.* at p. 1353.) The minor fled in a truck with three other young men. The police located the truck with the minor and his three companions. All four of them wore clothing with an element of red in it. (*Id.* at p. 1354.) The minor admitted going to the store to get alcohol but said his friends did not know he intended to steal it. One of his companions admitted they went to the store to obtain alcohol. (*Ibid.*) The minor was a Norteño gang affiliate, one of his friends was a gang

35

member, and another was a gang associate. (*Id.* at pp. 1357-1358.) The juvenile court declared the minor a ward and found that he had engaged in conduct that if committed by an adult would be robbery. The court also made true findings on three separate enhancement allegations, including a gang enhancement (§ 186.22(b)(1)). (*Daniel C.*, at p. 1357.)

On appeal, the minor in *Daniel C.* challenged the sufficiency of the evidence to support the gang enhancement and the appellate court agreed that there was insufficient evidence to support the specific intent prong of the enhancement. (*Daniel C., supra,* 195 Cal.App.4th at pp. 1357-1365.) Distinguishing *Albillar*, the court concluded that there was no evidence the minor acted in concert with his companions when he stole the whiskey and assaulted the store employee. The minor's companions left the store before he stole the liquor and did not assist him in assaulting the store employee; there was no evidence they saw what happened after they left the store or that the store employee knew they were gang members. (*Id.* at p. 1361.) The court reasoned that since there was no evidence the minor's companions committed any crimes in connection with the theft of the whiskey, it could not be inferred from the circumstances of the minor's crime, standing alone, that his purpose was to promote, further, or assist criminal conduct by gang members. (*Id.* at p. 1361.) There was no evidence the minor or his friends did anything while in the store to identify themselves with a gang, other than wear clothing with red on it. No gang signs or words were used and there was no evidence anyone who witnessed the crime knew gang members were involved. (*Id.* at p. 1363.) The court found no evidence to support the gang expert's opinion that the minor and his friends "planned or executed a violent crime in concert . . . to enhance their respect in the community or, or to instill fear" since there was no evidence they entered the store with the intent to commit a violent crime. The juvenile court had found that "the breaking of the bottle was 'happenstance' " and that the attack on the employee was a "spur-of-the-moment" reaction to the employee's attempt to recover the bottle. (*Ibid.*)

36

Defendant argues that the facts here are weaker than those in *Frank S.* or *Muniz* because he never admitted his conduct was gang-related or made any statements of his intent; he asserts there was no evidence that he was with another gang member or that the crime occurred in gang territory. He contends there was no evidence anyone knew he had a gun. He argues that the taping of the gun handle is the only evidence that ties the gun to a gang, but that there was no evidence that the practice of taping guns was unique to gangs. Defendant also argues that the testimony regarding the value of a stolen car to a gang is even more speculative, since it "could be a common tactic employed by any criminal who seeks to conceal his identity after committing a crime."

We begin by examining the sufficiency of the evidence to support the specific intent prong of the gang enhancements (§ 186.22(b)(1)) on both counts. In other words, we determine whether there was substantial evidence that defendant stole the car and carried the loaded firearm in the car (§ 12031, subd. (a)(1)) "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22(b)(1)). "[T]he scienter requirement in section 186.22(b)(1) . . . applies to *any* criminal conduct, without a further requirement that the conduct be 'apart from' the criminal conduct underlying the offense of conviction sought to be enhanced." (*Albillar*, *supra*, 51 Cal.4th at p. 66.) *Albillar*, which involved multiple defendants, held that "if substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*Id.* at p. 68; see also *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 [it was "fairly inferable" that the defendant "intended to assist criminal conduct by his fellow gang members" where there was evidence that he intended to commit the crimes, that he intended to commit them in association with his accomplices, and that he knew his accomplices were members of his gang].) Notably, *Vang* (which upheld gang enhancements) also involved multiple gang members acting in concert to commit the crimes at issue. But in this case,

37

defendant was acting alone. There is no evidence he had any accomplices. Thus, this rule from *Albillar* does not resolve the question presented here.

Since we hold that a lone actor may be subject to the gang enhancement, we must determine whether, absent evidence that defendant acted in concert with other gang members, there was substantial evidence that he committed the offenses with the specific intent to promote, further, or assist in any criminal conduct by gang members. For example, the prosecution could have presented evidence that another gang member had directed defendant to steal a car to use in a robbery, or that defendant was transporting the loaded gun from one gang member to another to use in a robbery or drive-by shooting. There was no such evidence. Unlike *Muniz*, where the defendant admitted to the investigating officer that he was preparing to commit a retaliatory drive-by shooting when the officers saw him holding a loaded semiautomatic rifle, defendant never admitted that he stole the car or transported the gun to promote, further, or assist in any criminal conduct by gang members.

Under *Albillar* and *Vang*, the jury could rely on Officer Rocha's responses to hypothetical questions as circumstantial evidence of defendant's specific intent to promote, further, or assist in any criminal conduct by gang members to support their findings on the gang enhancement as long as those questions are based on the evidence presented at trial. (*Albillar*, *supra*, 51 Cal.4th at pp. 63-68; *Vang*, *supra*, 52 Cal.4th at p. 1048.) At trial in this case, the prosecutor asked Officer Rocha hypothetical questions related to the specific intent prong of the gang enhancement (§ 186.22(b)(1)). First, regarding the firearm offense, she asked, "In your opinion, does a gang member being in possession of a firearm promote, further or assist felonious conduct by gang members?" Officer Rocha responded that it did. For example, when a Norteño gang member is shot, the gang's response is "to shoot at a rival within an hour. . . . [T]he Sureños know this. So it boosts their reputation, it boosts the fear in the community." In response to leading questions, Officer Rocha added that gang members use firearms to protect their drug

sales territory and other gang members, and that having a firearm makes it easier for gang members to commit crimes. The prosecutor also asked, "We talked about the effect that . . . a gang member having a firearm has on the community. Does that [effect] promote, further or assist criminal conduct by gang members?" Officer Rocha responded that it did because "[t]hey know that it stops individuals from coming out and being witnesses to these crimes." However, unlike *Albillar*, where there was evidence that persons associated with the defendants attempted to intimidate the victim, there was no evidence that the gun defendant transported was brandished or shown to anyone or used to intimidate persons in the community. Officer Lopez testified that it was hidden under the front passenger seat and was not visible from outside the car. As in *Daniel C.*, there was no evidence that any victim in this case or anyone in the local community knew defendant was a gang member, was affiliated with a gang, or was acting with a gang purpose.

The only facts that the prosecution asked the expert to consider in the hypothetical were (1) the person was a gang member; and (2) he possessed a gun. In our view this was insufficient to impose the gang enhancement (§ 186.22(b)(1)) on the carrying a loaded firearm in a vehicle count (§ 12031, subd. (a)(1); count 1). Although *Albillar* instructs that the prosecution may rely on the charged offense as the criminal conduct supporting the enhancement when the defendant acts in concert with others, in a case such as this, where the defendant acts alone, the combination of the charged offense and gang membership alone is insufficient to support an inference on the specific intent prong of the gang enhancement. Otherwise, the gang enhancement would be used merely to punish gang membership. As the court stated in *Rodriguez,* "[m]ere active and knowing participation in a criminal street gang is not a crime." (*Rodriguez, supra*, 55 Cal.4th at p. 112.) We therefore hold that the expert testimony in response to the hypothetical in this case was insufficient to support an inference that defendant carried the gun in the vehicle with the specific intent required for the gang enhancement.

Second, regarding the vehicle theft (Veh. Code, § 10851, subd. (a); count 3), the prosecutor asked, "Does a gang member being in possession of a stolen vehicle promote, further or assist criminal conduct by gang members in any way?" Officer Rocha testified that it did. He explained that when law enforcement officers set up a perimeter to apprehend gang members that are running from the officers because they have committed crimes, the gang members will use a cell phone and call for someone to pick them up and get them out of the area. He also testified that a stolen vehicle "helps assist other gang crimes" and stated "the majority of time when drive-by shootings are done, they are done by cars that have been stolen." In this case, although the officers examined defendant's phone, there was no evidence that he had used the Chrysler to pick up one or more fleeing gang members, that he intended to use the car to commit another gang crime separate and apart from the vehicle theft, or that there were any drive-by shootings or attempted drive-by shootings that night in Salinas. In our view, this evidence suffers from the same weakness as the testimony on the firearm count since the hypothetical asked the expert to consider only two facts: (1) possession of a stolen vehicle (2) by a gang member. Following the reasoning set forth above, we hold that the expert testimony in response to the hypothetical about a stolen vehicle was insufficient to support an inference that defendant stole the car with the specific intent to promote, further, or assist in any criminal conduct by gang members (§ 186.22(b)(1)).

And like *Frank S.* and *Ochoa*, there was no evidence that defendant was in Norteño territory or rival gang territory when he stole the car; that he called out a gang name, displayed gang signs or otherwise stated his gang affiliation; or that the victims of the car theft were rival gang members or saw his tattoos or gang clothing. Here, although there was evidence that auto thefts and illegal gun possession were among the primary activities of the Norteño gang in Salinas, that evidence alone was insufficient to support the inference that defendant stole the Chrysler and possessed the gun with the specific intent to promote, further, or assist in any criminal conduct by gang members.

40

For all these reasons, we hold that there was insufficient evidence to support the specific intent prong of the gang enhancement (§ 186.22(b)(1)) on both the vehicle theft (Veh. Code, § 10851, subd. (a)) and the carrying a loaded firearm in a vehicle (§ 12031, subd. (a)(1)) counts. Since we conclude there was insufficient evidence on the specific intent prongs of both enhancements, we need not address the sufficiency of the evidence to support the gang-related prong of those enhancements.

## V. *Alleged Errors in Jury Instructions*

Defendant argues that if we conclude that the gang participation offense and the gang enhancements were supported by substantial evidence, "they must still be reversed and remanded for a new trial based on the trial court's failure to adequately instruct the jury in light of *Rodriguez*." He contends the jury should have been instructed that (1) a defendant is only guilty of the gang participation offense "if he commits the felonious criminal conduct collectively with other gang members"; and (2) for the gang enhancement to apply, the defendant must act with the specific intent to promote, further, or assist in criminal conduct done collectively with other gang members. Since we are reversing the conviction on the gang participation count (§ 186.22, subd. (a)) as well as the true findings on the gang enhancements (§ 186.22, subd. (b)(1)), we need not address these contentions.

## VI. *Fines and Fees*

Defendant argues that: (1) the second restitution fine of $5,400 (§ 1202.4) must be stricken because the court had already imposed a restitution fine of $600 when it granted probation; (2) the parole revocation restitution fine (§ 1202.45) must be reduced to $600 to match the correct amount of the restitution fine; and (3) the $90 court facilities assessment (Gov. Code, § 70373) and the $120 court security fee (§ 1465.8) imposed on

41

October 6, 2011, must be stricken because the court had already imposed them when it granted probation on June 21, 2011.

The Attorney General concedes these errors. She agrees that the $5,400 restitution fine (§ 1202.4) should be stricken and argues that the original $600 fine should be imposed. The Attorney General does not address the section 1202.45 parole revocation restitution fine, but based on her concession regarding the section 1202.4 restitution fine, presumably she agrees that the corresponding parole revocation restitution fine must be corrected. The Attorney General also concedes that the second court facilities assessment and the second court facilities fee must be stricken. And although the Attorney General concedes that the conviction on the gang participation count (§ 186.22(a)) must be reversed, neither party discusses the effect of such a reversal on the fines and fees.

We agree that the trial court erred when it imposed the second restitution fine of $5,400 (§ 1202.4) and when it imposed and stayed a parole revocation restitution fine (§ 1202.45) in the same amount. The section 1202.4 restitution fine may only be imposed once at the time the court pronounces judgment and the court may not increase the restitution fine when revoking probation. (*People v. Perez* (2011) 195 Cal.App.4th 801, 805.) The court may not impose a second restitution fine after probation has been revoked because the original fine survives the revocation of probation. (*People v. Cropsey* (2010) 184 Cal.App.4th 961, 964-965 (*Cropsey*).) For these reasons, subject to the modifications set forth below, we accept the Attorney General's concession regarding the section 1202.4 restitution fine.

When defendant was first sentenced, the trial court ordered him to pay "a total restitution fine of $600. That's $200 for each felony." Since we are reversing the gang participation count (§ 186.22(a)), the restitution fine should be reduced to $400 ($200 times two counts). The amounts of the probation revocation restitution fine (§ 1202.44) and the parole revocation restitution fine (§ 1202.45) should also be reduced to $400,

42

since those fines must be "in the same amount" as the section 1202.4 fine.  (§§ 1202.44, 1202.45.)

Both times defendant was sentenced, the court imposed a $90 court facilities assessment ($30 for each count; Gov. Code, § 70373) and a $120 court security fee ($40 for each count; § 1465.8).  We agree that the court facilities assessment and court security fee imposed in October 2011 must be stricken because the court had already imposed them when it granted probation in June 2011.[12]  We therefore accept the Attorney General's concession regarding these fees.  But since the total amount of the assessment and fee are based on the number of counts and we are reversing the gang participation conviction (§ 186.22(a)), upon resentencing, the trial court should reduce the amount of the court facilities assessment (Gov. Code, § 70373) to $60 ($30 times two counts) and the court security fee (§ 1465.8) to $80 ($40 times two counts).

## DISPOSITION

The judgment is reversed.  The trial court is directed to strike the gang participation (§ 186.22(a)) conviction in count 4 and the true findings on the gang enhancements (§ 186.22(b)(1)) in counts 1 and 3.  The case is remanded to the trial court for resentencing on the carrying a loaded firearm in a vehicle conviction (§ 12031, subd. (a)(1); count 1) and the vehicle theft conviction (Veh. Code, § 10851, subd. (a); count 3) and on the enhancement to count 1 for carrying a loaded firearm for which defendant was not the registered owner (§ 12031, subd. (a)(2)(F)).

The trial court's orders of October 6, 2011, imposing a restitution fine of $5,400 (§ 1202.4), a $90 court facilities assessment (Gov. Code, § 70373), and a $120 court

_____

[12]  As the court suggested in *Cropsey*, rather than impose the same fine or fee twice or "reimposing" a fine or fee that has been previously imposed, "the trial court should simply say, 'The abstract of judgment should reflect the [fines and fees] previously imposed.' "  (*Cropsey*, *supra*, 184 Cal.App.4th at p. 966.)

security fee (§ 1465.8) are also stricken. Upon resentencing, the court is directed to reconsider and correct the amounts of the restitution fine (§ 1202.4), the probation revocation restitution fine (§ 1202.44), the court facilities assessment (Gov. Code, § 70373), and the court security fee (§ 1465.8) imposed on June 21, 2011, and the amount of the parole revocation restitution fine (§ 1202.45) that was imposed and suspended on October 6, 2011, in light of the opinions expressed herein regarding those fines and fees.

_____
Márquez, J.

WE CONCUR:


_____
Elia, Acting P. J.


_____
Bamattre-Manoukian, J.



People v. Rios
H038487

Trial Court:                                    Monterey County
                                                Superior Court Nos.: SS102818A and
                                                SS111533C

Trial Judge:                                    The Honorable Pamela L. Butler


Attorney for Defendant and Appellant            Patrick McKenna
Jose Rios:                                      under appointment by the Court of
                                                Appeal for Appellant




Attorneys for Plaintiff and Respondent          Kamala D. Harris,
The People:                                      Attorney General

                                                Dane R. Gillette,
                                                Chief Assistant Attorney General

                                                Gerald A. Engler,
                                                Senior Assistant Attorney General

                                                Rene A. Chacon,
                                                Supervising Deputy Attorney General

                                                Linda M. Murphy,
                                                Deputy Attorney General

People v. Rios
H038487