Filed 12/15/15  P. v. Jefferson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C078216 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F02981) |
| v. | |
| MAURICE JEFFERSON, | |
| Defendant and Appellant. | |

A jury found defendant Maurice Jefferson guilty of two counts of being a felon in possession of a firearm (Pen. Code, § 29800, subd. (a)(1))[1] and one count of driving with willful or wanton disregard for the safety of persons or property while fleeing from a pursuing police officer (Veh. Code, § 2800.2).  The jury also found true the gang enhancement allegations made in connection with the firearm offenses (§ 186.22, subd.

---

[1] Unless otherwise specified, all further statutory references are to the Penal Code.

1

(b)(1)). In a bifurcated proceeding, the trial court found true the allegations that defendant had a prior strike conviction (§§ 1170.12; 667, subds. (b)-(i)), a prior serious felony conviction (§ 667, subd. (a)), and served a prior prison term (§ 667.5, subd. (b)). Defendant was sentenced to 16 years 8 months in prison. On appeal, defendant contends: (1) there was insufficient evidence to convict him of being a felon in possession of a firearm; (2) the trial court erred in instructing the jury that the prior felony conviction element of the firearm offenses was established by stipulation; and (3) there was insufficient evidence to support the jury's true finding on the gang enhancements. We disagree and shall affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Background

#### 1.     Events of May 5, 2013

On May 5, 2013, at approximately 7:00 p.m., Sacramento Police Officers Jeffrey Daigle and Ryan Trefethen observed a black GMC Yukon occupied by two Black males driving westbound on Meadowview Road in Sacramento. The driver, later determined to be defendant, appeared to be in his mid-20's. He had dreadlocks and was wearing a red hat and a black shirt. Officer Trefethen ran the Yukon's license plate number and it came back as a stolen Honda. The officers decided to follow the Yukon and double-check the report on the license plate.

Due to traffic, the officers lost sight of the Yukon for a short period of time. When they located the Yukon, Officer Daigle turned his patrol car around so that he could conduct a traffic stop. When he did so, defendant quickly accelerated his vehicle. Officer Daigle then activated his lights and sirens and began pursuing the Yukon. Defendant drove 50 to 55 miles per hour through a 25-mile-per-hour residential area, running several stop signs and a red light. During the pursuit, Officer Daigle observed a red hat "come out" of the driver's side window of the Yukon. A videotape from a home surveillance camera shows that a handgun was thrown out the driver's side window of the

2

Yukon.[2] The handgun, a .45-caliber Grizzly Arms Mark One pistol, was found about 15 feet from the red hat. It was loaded with one bullet in the chamber and six more in the magazine.

Approximately mid-block on Anoka Avenue, defendant slammed on his brakes, got out of his vehicle, and fled on foot. Officer Daigle stopped his car and pursued defendant on foot but was unable to apprehend him.

Meanwhile, Officer Trefethen remained with the Yukon and made contact with the passenger, Joseph Whaley, a member of the 29th Street Crips gang. Officer Trefethen searched the Yukon, locating some mail addressed to Gerald Jefferson and a flip phone, which contained a picture of defendant. Later that evening, Officers Daigle and Trefethen contacted Jefferson and learned that he was not the driver of the Yukon. Thereafter, the officers were shown a photograph of defendant. Both identified the person in the photograph as the driver of the Yukon.

### 2. Events of May 25, 2013

On May 25, 2013, Officer Trefethen was on patrol with Officer Michael Severi in the Meadowview area of Sacramento. At around 8:30 p.m., the officers arrived at Meadowview Market. As they were pulling into the parking lot, Officer Trefethen noticed two Black males walking away from a vehicle[3] toward an apartment building. One of the individuals was defendant. Officer Trefethen pulled his car alongside the individuals and said: "Hey, Maurice." Defendant looked back at Officer Trefethen and then immediately turned away, jumped a fence, and took off running through the

---

[2] The car chase was captured by the patrol car's surveillance camera. A home surveillance camera also captured the chase. It shows a red hat and handgun exiting the driver's side window of the Yukon. Both videos were played for the jury.

[3] Inside the vehicle were two members of the Starz gang and a firearm.

apartment complex. Officer Severi chased defendant on foot but was unable to apprehend him. During the pursuit, Officer Severi heard a metal object hit the ground. In the area where he heard the noise, Officer Severi found a nine-millimeter semi-automatic Jiminez Arms pistol. It was loaded with one bullet in the chamber and nine in the magazine.

### 3. Events of July 19, 2013

On July 19, 2013, Officer Trefethen was, again, on patrol with Officer Michael Severi in the Meadowview area of Sacramento. At about 9:30 p.m., the officers observed a Toyota Solara parked at a gas station. The Solara caught the officers' attention because it was a vehicle that defendant had been known to drive. As the officers approached the Solara, defendant got out of the car and fled on foot. Officer Trefethen chased defendant but was unable to apprehend him.

### 4. Events of July 26, 2013

On July 26, 2013, numerous police officers, including Officers Trefethen and Severi, responded to a residence where defendant was living in Sacramento. Several officers set up a perimeter on the rear and sides of the house, while Officer Trefethen and other officers approached the front of the residence. Officer Trefethen knocked on the front door and announced: "Sacramento Police Department." Within a minute or two, several people, including defendant and an individual associated with the Starz gang, emerged from the residence. Law enforcement officers searched the house and found three guns, a large amount of marijuana, and $20,000 in cash.

### B. Procedural Background

On June 5, 2013, a felony complaint was filed against defendant in the Sacramento County Superior Court. On February 24, 2014, an amended felony complaint was filed, charging defendant with two counts of being a felon in possession of a firearm (§ 29800, subd. (a)(1)) and one count of driving with a willful or wanton disregard for the safety of persons or property while fleeing from a pursuing police officer (Veh. Code, § 2800.2).

4

The amended complaint alleged gang enhancements in connection with the firearm offenses (§ 186.22, subd. (b)(1)).  The amended complaint also alleged that defendant had a prior strike conviction (§§ 1170.12, 667, subds. (b)-(i)), a prior serious felony conviction (§ 667, subd. (a)) for assault with a firearm (§ 245, subd. (a)(2)), and served a prior prison term (§ 667.5, subd. (b)).

Trial commenced on September 3, 2014.  At trial, the jury heard testimony from several police officers, including a gang expert.  Defendant did not call any witnesses or present any evidence in his defense other than through cross-examination of the People's witnesses.

On September 12, 2014, the jury found defendant guilty of both charges alleged in the amended complaint and found true the gang enhancement allegations.  On November 21, 2014, in a bifurcated proceeding, the trial court found all the special allegations to be true.

The trial court sentenced defendant to a total of 16 years 8 months in prison, calculated as follows:  eight years for count one, comprised of the upper term of three years for being a felon in possession of a firearm, doubled for the prior conviction, plus two years for the gang enhancement; a consecutive sixteen months for count two, comprised of one-third the midterm (i.e., eight months) for driving with willful or wanton disregard for the safety of persons or property while fleeing from a pursuing police officer, doubled for the prior conviction; and a consecutive seven years four months on count three, comprised of one-third the midterm (i.e., eight months) for being a felon in possession of a firearm, doubled for the prior conviction, plus one year for the gang enhancement, plus five years for the prior prison term enhancement.

Defendant filed a timely notice of appeal.

**DISCUSSION**

**A.     Sufficiency of the Evidence**

To assess the sufficiency of the evidence, we review the whole record to determine whether it discloses substantial evidence to support the verdict--i.e., evidence that is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Maury* (2003) 30 Cal.4th 342, 396.)  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.  (*People v. Boyer* (2006) 38 Cal.4th 412, 480.)  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 (*Lindberg*).)  " 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' "  (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)

**1.     Felon in Possession of a Firearm**

Defendant contends that the record does not contain substantial evidence to support his convictions for being a felon in possession of a firearm.  According to defendant, there is no evidence in the record establishing that he was convicted of a felony prior to his possession of a firearm on May 5, 2013, and May 25, 2013.  We disagree.

The elements of the offense of felon in possession of a firearm are "conviction of a felony and ownership or knowing possession, custody, or control of a firearm."  (*People v. Blakely* (2014) 225 Cal.App.4th 1042, 1052.)  Here, the record reflects that the parties entered into a stipulation during trial, which stated as follows:  "The People and the defense stipulate that the defendant had a felony conviction prior to his arrest on July 26, 2013."  At the close of the People's case, the prosecutor read the stipulation to the jury.  Defendant did not object when the stipulation was read to the jury or when the trial judge

6

instructed the jury that they must accept stipulated facts as true, including the fact that defendant was previously convicted of a felony.[4] Instead, defendant contends for the first time on appeal that the stipulation was insufficient to establish the prior felony element of the firearm offenses because he could have been convicted of a felony prior to July 26, 2013, but after May 25, 2013, and/or May 5, 2013.

As an initial matter, defendant is barred from taking an appeal claiming defects in the stipulation. (*People v. Gurule* (2002) 28 Cal.4th 557, 623 ["when a party enters into a voluntary stipulation, he generally is precluded from taking an appeal claiming defects in the stipulation"]; *People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 [same].) Moreover, even assuming defendant is not precluded from raising this issue, we conclude there is substantial evidence in the record to support the jury's verdict. The parties' stipulation established as true that defendant had a prior felony conviction. (See *People v. Palmer* (2013) 58 Cal.4th 110, 118 (*Palmer*) ["[C]ounsel may stipulate to the existence . . . of essential facts. . . . Stipulations obviate the need for proof and are independently sufficient to resolve the matter at issue in the stipulation"].) Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could have found that defendant was convicted of a felony prior to his possession of a firearm on May 5, 2013, and May 25, 2013. While no evidence was presented as to the actual date of defendant's prior felony conviction, and it is possible that defendant could have been convicted of a felony prior to his arrest on July 26, 2013, but after May 25, 2013, and/or May 5, 2013,[5]

_____

[4] Presumably, defendant did not object to the stipulation because he benefited from it as the stipulation prevented the jury from learning the details of his prior conviction for assault with a deadly weapon, a firearm.

[5] Nothing in the record supports the conclusion that defendant was convicted of a felony after May 25, 2013, or May 5, 2013, but before July 26, 2013. Indeed, as defendant concedes, the evidence shows that he was "at large" from May 5, 2013, until his arrest on July 26, 2013.

this does not establish that defendant's convictions were not supported by substantial evidence. (See *Lindberg, supra*, 45 Cal.4th at p. 27 [reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding].)

### 2.    Gang Enhancements

Defendant contends that the record contains insufficient evidence to support the jury's finding that he possessed a gun for the benefit of, at the direction of, or in association with a criminal street gang. Defendant asserts that the "critical issue in this case" is whether he possessed a firearm on May 5, 2013, or May 25, 2013, "to benefit, further, promote or assist the gang or . . . for personal reasons." According to defendant, there was no evidence supporting the jury's determination that "the gun was possessed . . . to benefit, further, promote or assist the gang."[6] We disagree.

### a.    Substantive Law

To establish a gang enhancement, the prosecution must prove the defendant committed the underlying crime: (1) " ' "for the benefit of, at the direction of, or in association with any criminal street gang" ' " (the gang-related prong); and (2) " ' "with the specific intent to promote, further, or assist in any criminal conduct by gang members" ' " (specific-intent prong). (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047.) The specific-intent prong does not require that the criminal conduct by a gang member be distinct from the charged offense, or that the evidence establish specific

---

[6] We note that defendant's sufficiency of the evidence argument does not distinguish between the two prongs (i.e., the gang-related prong and specific-intent prong) the prosecution must prove to subject a defendant to a gang enhancement. (*Albillar, supra*, 51 Cal.4th at p. 59.) Instead, defendant discusses elements of the two prongs together. We view defendant's argument as a challenge to the sufficiency of the evidence as to both prongs of the gang enhancement test.

crimes that defendant intended to assist his fellow gang members in committing. (*Albillar, supra*, 51 Cal.4th at p. 66.) The enhancement set forth in section 186.22(b)(1) "applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (*Albillar*, at p. 68.)

" 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 [stating that an expert's opinion, "if found credible, might, together with the rest of the evidence, cause the jury to find the [crime] was gang related"].) As with other types of expert witnesses, the prosecution is authorized to elicit testimony from a gang expert by asking hypothetical questions. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946.) Thus, a gang expert may render an opinion on the basis of a hypothetical question that asks the expert to assume the truth of specified facts, provided the hypothetical is " 'rooted in facts shown by the evidence.' " (*Vang, supra*, 52 Cal.4th at pp. 1045-1046.)

### b. Gang Expert's Testimony

Sacramento Police Officer Joseph Ellis, a detective in the gang investigation unit, testified as a gang expert on behalf of the People regarding the Starz gang in Sacramento. At the time of trial, Detective Ellis was a 15-year veteran of the police force and had been assigned to the gang unit since June 2012. His "specialty" was African-American gangs in the Mack Road, Valley High, Laguna, and Meadowview areas of Sacramento. His primary duties were to investigate gang-related crimes and to gather intelligence on gangs, including the identity of gang members and their monikers (i.e., nicknames) as well as the location where gang members hung out. Prior to testifying, Detective Ellis had participated in no less than 300 gang investigations and had contact with 36 members of the Starz gang.

Detective Ellis testified that Starz is a street gang comprised of mostly African-American males. It is a subset of a gang called G-Mobb. Starz is a rival of the gangs

9

known as Gunz Up[7] and the Oak Park Bloods. It had a longstanding feud with the Oak Park Bloods and their subsets, while it had an alliance with the 29th Street Crips. Starz and the 29th Street Crips live in the same area and share a common enemy, the Oak Park Bloods.

Detective Ellis testified that members of Starz live throughout the Mack Road/Valley High corridor and are most prevalent in the Mack Road area of Sacramento. He further testified that in order to become a member of Starz, a person has to be "willing to put in work" for the gang, such as beating up a rival gang member, shooting or robbing someone, stealing a car, or committing other crimes. In his experience, the primary activities of Starz gang members are gun possession, felony assaults, and murder. He stated that it is "very" common for members of Starz to carry guns both inside and outside of their territory.

Detective Ellis opined that the primary objective of Starz gang members is to be respected within their own gang, rival gangs, and in the community. He explained that "putting in work" (i.e., committing crimes) and carrying a gun are ways for gang members to gain respect and enhance their reputation. He also explained that a gun is a "tool" for a gang's "work," and that rival gang members and people in the community know who carries a gun, which "goes a long way for that gang member [in] garner[ing] respect and fear . . . ." According to Detective Ellis, criminal activity by one gang member benefits the whole gang by increasing fear, and carrying a gun furthers the reputation of the gang because it shows a gang member is not going to get caught

---

[7] The Gunz Up gang was created by a group of Starz members after they had a "falling out" with Starz. Gunz Up and the Oak Park Bloods were allies. From 2007 to 2011, there were violent back-and-forth shootings between Gunz Up and Starz. At the time of trial, Gunz Up was "pretty much done" because everyone in the gang was in prison or dead.

"lackin" or "slipping," i.e., they are not going to get "jumped" or shot because they do not have a gun. He added that carrying a gun "means you are serious, you're down for the cause, you're down for your gang, you are down for your fellow members." He also noted that other gang members "might not mess with you" if you carry a gun, and that if a gang member has a gun, they are expected to use it if "something happens."

Detective Ellis testified that, in May 2013, the conflict between Starz and the Oak Park Bloods was "very tense" and "volatile" with "a lot of shootings going back and forth." At that time, it was "funk on site," meaning that: "You could just be going down the street and a rival gang member jumps out and assaults you or shoots at you." Detective Ellis stated that if a member of Starz came in contact with an Oak Park Blood he was expected to "jump" or shoot them. He explained that there were two "origins" to this "very tense time" between Starz and the Oak Park Bloods: (1) a member of the 4th Avenue Bloods (an Oak Park Blood subset) stole a car from the leader of Starz;[8] and (2) a Starz gang member made a video on YouTube disrespecting several Oak Park Bloods by name. According to Detective Ellis, the stealing of the car was an "ultimate" sign of disrespect that Starz did not tolerate. He also testified that the YouTube video "set off a chain of events," including other "disrespectful" videos, which were followed by shootings and homicides. He explained that the airing of the disrespectful videos on social media triggered an "open season" on everybody in both gangs.

Based on police reports and photographs contained on a cell phone belonging to defendant, Detective Ellis opined that defendant is a member of Starz with the gang moniker "Reecey." Detective Ellis testified that police reports dating back to 2006 show that defendant wore gang-related clothes and associated with other gang members and

_____

[8] At that time, the leader of Starz instructed gang members to "take . . . out" 4th Avenue Bloods "on sight."

11

associates of gang members, including members of G-Mobb, the 29th Street Crips, and Starz. One of the police reports indicated that defendant was shot in an area associated with the Oak Park Bloods while riding in a car with members of G-Mobb. In another police report, defendant was identified as the individual who "pistol whipped" a carjacking victim. The report indicated that defendant was with a gang member at the time of the carjacking. With respect to the police reports prepared in connection with the underlying firearm charges, Detective Ellis testified that defendant was with a member of an allied gang (29th Street Crips) on May 5, 2013, and with two Starz gang members on May 25, 2013, one of whom had a firearm. He also testified that when defendant was arrested on July 26, 2013, one of the individuals in the residence with defendant was an associate of Starz, and that three guns, a large amount of marijuana, and $20,000 in cash were found inside the residence.

With respect to the photographs on defendant's cell phone, Detective Ellis testified that some of them showed defendant making a common hand gesture used by Starz gang members to signify "guns down," which is a sign of disrespect to their rival Gunz Up. One of the pictures was followed by the words: "Who coming to fuck with Reecey today, hash tag, real mob nigga." In another picture, defendant was "throwing [the] guns down" gesture and wearing a jacket that said "MIP Tra 1992 to 2012," which Detective Ellis believed referred to Trabel Thomas, an individual who was associated with various gangs.

Based on a hypothetical question that tracked the evidence in this case related to the May 5, 2013, firearm charge, Detective Ellis opined that possession of a gun by the hypothetical gang member would be for the benefit of, at the direction of, or in association with, a gang with the intent to promote, further, or assist in criminal conduct by gang members. He explained that the possession of a gun was in association with a gang because the gang member in the hypothetical was with a member of an ally gang who knew he had a gun and why he had a gun. He further explained that possession of a

12

gun under the circumstances would benefit the gang and assist criminal conduct because the hypothetical gang member could use his gun if he had "to go shoot at somebody" or had an "interact[ion]" with a rival gang member.

Based on another hypothetical question that tracked the evidence in this case related to the May 25, 2013 firearm charge, Detective Ellis opined that possession of a gun by the hypothetical gang member would be for the benefit of, at the direction of, or in association with, a gang with the intent to promote, further, or assist in criminal conduct by gang members. He explained that the possession of a gun was associated with a gang because the gang member in the hypothetical was speaking to two members of his gang, one of whom also possessed a firearm, at the time law enforcement officers confronted him. He further explained that possession of a gun under the circumstances would benefit the gang and assist criminal conduct because the hypothetical gang member possessed a gun if he had "to go shoot at somebody" or had an "interact[ion]" with a rival gang member.

### c.     Analysis

Viewing the evidence in the light most favorable to the verdicts, we conclude that there is substantial evidence in the record to support the jury's gang enhancement findings. The Court of Appeal, Fourth Appellate District's opinion in *People v. Garcia* (2007) 153 Cal.App.4th 1499 (*Garcia*) is instructive. In that case, officers stopped the defendant, an active gang member who had committed gang crimes, for a traffic violation and found an unregistered, loaded handgun. (*Id.* at pp. 1502-1504.) There was evidence that, not only was the defendant an active gang member who had knowledge of the inner workings of the gang, but he had been in the gang for many years and had committed enough street crimes to have gained respect within the gang. (*Id.* at p. 1504.) An expert testified that guns were " 'huge' " within the gang. (*Id.* at p. 1503.) He also testified that if a gang member possessed a gun, all of the other gang members would know about it, and that the gang's status would benefit from a gang member's reputation for carrying a

firearm. (*Ibid.*) He stated that guns were used to intimidate members of their own gang, as well as other gangs and nongang members. (*Ibid.*) The expert explained: " '[P]ossession of the gun, it's power within the gang itself. It's a way [a gang member is] going to protect himself, and other gang members from a retaliation on rival gang members. [¶] Therefore, it's going to benefit the gang, and the gang member himself.' " (*Id.* at p. 1506.) He further explained that guns were a sign of violence, and violence was used to gain respect, which is " 'everything' " to a gang member. (*Id.* at p. 1503.) Based on these facts and others, including defendant's gang-related criminal history, the expert opined that defendant's possession of a firearm was to benefit the gang because the gang's status would increase if defendant were reputed to possess a firearm. (*Id.* at pp. 1504-1506.) While defendant claimed he had been shot and only possessed the gun for self-defense, the court concluded that sufficient evidence supported the jury's true finding on the gang enhancement. (*Id.* at p. 1512 [concluding that while evidence may be sufficient to support finding the defendant possessed gun out of fear, it was also sufficient to support finding he did so to promote, further, or assist the gang].)

Here, the People introduced evidence that one of Starz's primary criminal activities was the possession of guns, that defendant was a member of Starz with the gang moniker "Reecey," and that defendant had a history of being involved in incidents where guns and gang members were present, including an incident where defendant was a victim of a gang-related shooting and an incident where defendant used a gun to facilitate a carjacking with another gang member. There was also evidence presented that defendant possessed a gun in Starz's territory with one allied gang member on May 5, 2013, and possessed a gun in Starz's territory with two Starz gang members on May 25, 2013, one of whom also possessed a firearm. Further, the jury heard evidence that gang members are aware of who carries a gun in a gang, and that carrying a gun is a way for gang members to "put in work" for the gang because guns facilitate the commission of crimes and because their possession garners respect within one's own gang, rival gangs,

14

and the community. The jury also heard evidence that defendant had reason to expect to use a gun in a gang-related offense on May 5, 2013, and May 25, 2013. Detective Ellis testified that, in May 2013, there was an ongoing violent feud between Starz and the Oak Park Bloods involving "back and forth" shootings, and that a Starz member would be expected to "jump" or shoot an Oak Park Blood on sight. In response to hypothetical questions, Detective Ellis opined that a gang member's possession of a gun under the circumstances presented in this case would be for the benefit of, at the direction of, or in association with a gang with the intent to promote, further, or assist in any criminal conduct by gang members because the hypothetical gang member was with other gang members and he could use his gun in an "interact[ion]" with a rival gang member, i.e., use the gun to shoot or protect himself from a rival gang member.

Based on the entire record, including evidence regarding defendant's gang membership and participation in incidents involving guns and gang members, the ongoing violent feud between Starz and the Oak Park Bloods, the expert testimony on the importance of guns in Starz and the respect gang members and gangs garner from possessing guns, we conclude that there was substantial evidence from which a reasonable jury could have found that defendant possessed a firearm on May 5, 2013, and May 25, 2013, for the benefit of, or in association with, a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members. (See *Garcia, supra*, 153 Cal.App.4th at pp. 1502-1506, 1512.)

Detective Ellis's opinion, together with the rest of the evidence in the record, is sufficient evidence to support the jury's findings on the gang enhancements. The evidence in the record supports a finding that defendant was a Starz gang member and possessed a gun for the benefit of the gang because Detective Ellis testified that possessing guns was one of the primary activities of Starz and that the possession of a gun by a gang member enhanced the gang's reputation. (See *Albillar, supra*, 51 Cal.4th at p. 63 ["Expert opinion that particular criminal conduct benefited a gang by enhancing

15

its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22 [subdivision] (b)(1)"].)[9]  The record also supports the finding that defendant possessed a gun with the specific intent to promote, further, or assist in criminal conduct by gang members.  Defendant possessed a gun with an allied gang member on May 5, 2013, and with two members of his own gang on May 25, 2013.  Detective Ellis testified that gang members know who carries a gun in a gang, and that, at the time defendant possessed a gun, Starz was involved in an ongoing violent feud with a rival gang that involved "back and forth" shootings.  He said that members of Starz were expected to "jump" or shoot rival gang members on sight.  Under these circumstances, defendant's intentional possession of a gun with known members of a gang affords sufficient evidence of the requisite specific intent.  (*Id.* at p. 68 ["[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members"].)

Defendant relies on *People v. Rios* (2013) 222 Cal.App.4th 542, 564, *In re Frank S.* (2006) 141 Cal.App.4th 1192, *People v. Ochoa* (2009) 179 Cal.App.4th 650, and *People v. Ramon* (2009) 175 Cal.App.4th 843, to support his argument that there was

---

[9] Alternatively, sufficient evidence supports a finding that defendant possessed a gun "in association with" a gang.  Here, there was evidence that defendant was with one or more gang members when he possessed a gun in May 2013.  Detective Ellis testified that a hypothetical gang member, under the circumstances presented in this case, including the existence of an ongoing violent feud with a rival gang, would possess the gun in association with his gang.  We conclude that a rational jury could have found defendant's gun possession was committed "in association with" a gang.  (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 ["[T]he jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members"].)

insufficient evidence to support the jury's findings on the gang enhancements. Defendant's reliance on these cases is misplaced. The cases cited by defendant stand for the proposition that when an expert's testimony is based solely on the expert's opinion without specific evidentiary support in the record linking the predicate crime to gang activity, such an opinion is insufficient to support a gang enhancement. (See *Rios, supra*, 222 Cal.App.4th at pp. 573-575 (*Rios*); *In re Frank S., supra*, 141 Cal.App.4th at pp. 1195-1199; *Ochoa, supra*, 179 Cal.App.4th at pp. 656-665 (*Ochoa*); *Ramon, supra*, 175 Cal.App.4th at pp. 849-853.) That proposition is inapplicable here. Contrary to defendant's contention, Detective Ellis did not simply offer an opinion informing the jury how he felt the case should be resolved. Instead, his opinions about how defendant's crimes were committed for the benefit of, or in association with, Starz, and whether the crimes were intended to promote, further, or assist in criminal conduct by gang members, were supported by his own experience with criminal street gangs in the Sacramento area as well as facts in the record showing a connection between defendant's possession of a firearm and gang activity. Detective Ellis's opinions were accompanied by a sufficient factual basis from which a reasonable jury could conclude that the gang enhancements apply.

### B.     Instructional Error

Defendant contends that the trial court erred by instructing the jury that the prior felony element of the firearm charges was established by stipulation because there was no evidence he was convicted of a felony prior to May 5, 2013, or May 25, 2013. According to defendant, the trial court's instructions regarding the significance of the parties' stipulation amounted to a directed verdict for the prosecution on the prior felony element and relieved the prosecutor of the burden of proving every element of the firearm charges beyond a reasonable doubt. We reject defendant's argument.

At the close of trial, the jury was instructed in accordance with CALCRIM No. 222, in part, as follows: "During the trial, you were told that the People and the defense

17

agreed or stipulated to certain facts. This means that they both accept those facts as true. Because there is no dispute about those facts, you must also accept them as true." The trial court told the jury that to convict defendant of unlawfully possessing a firearm, the People must prove, among other things, that "defendant had previously been convicted of a felony." The trial court also told the jury that "[t]he defendant and the People have stipulated or agreed that the defendant was previously convicted of a felony. This stipulation means that you must accept this fact as proved."

We conclude defendant has forfeited his right to challenge the trial court's instructions regarding the parties' stipulation because he failed to object to them or request any modification or amplification of them at trial. (*People v. Lee* (2011) 51 Cal.4th 620, 638.) "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal [citations]." (*Ibid.*) Moreover, even if defendant had not forfeited his right to challenge the instructions, we would conclude that the instructions were adequate. The parties' stipulation established as true that defendant had a prior felony conviction. (See *Palmer, supra*, 58 Cal.4th at p. 118.) As given, CALCRIM No. 222 correctly informed the jury that they must accept stipulated facts as true. Further, the trial court properly explained the legal effect of the parties' stipulation. The trial court advised the jury that defendant and the People have stipulated that defendant was previously convicted of a felony, and that they must accept this fact as proved. Accordingly, because the trial court's instructions correctly stated the law and were supported by the evidence admitted at trial, we find no instructional error.

## DISPOSITION

The judgment is affirmed.

/s/
Blease, J.

We concur:

/s/
Raye, P. J.

/s/
Duarte, J.