Filed 8/17/21  P. v. Quevedo CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JONATHAN QUEVEDO,<br><br>    Defendant and Appellant. | 2d Crim. No. B300862<br>(Super. Ct. No. BA456662)<br>(Los Angeles County) |

Jonathan Quevedo appeals from the judgment entered after a jury had found him guilty on 10 counts involving four victims: three counts of assault with a deadly weapon, to wit, a cane and the base unit of a telephone (Pen. Code, § 245, subd. (a)(1));[1] two counts of willful, deliberate, and premeditated attempted murder (§§ 187, subd. (a), 189); one count of discharging a firearm at an occupied motor vehicle (§ 246); one count of dissuading a witness by use of force (§ 136.1, subd. (c)(1)); two counts of assault with a

---

[1] All statutory references are to the Penal Code.

semiautomatic firearm (§ 245, subd. (b)); and one count of possession of a firearm by a convicted felon (§ 29800, subd. (a)(1)).

The jury found true allegations that all of the offenses had been committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).  As to the convictions for attempted murder and shooting at an occupied motor vehicle, the jury found true allegations that appellant had personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)).  Except for the convictions of assault with a deadly weapon, the jury found true allegations that appellant had committed the offenses while released from custody on another felony offense (§ 12022.1).

The court found true one prior serious felony conviction (§ 667, subd. (a)(1)), three prior prison terms (§ 667.5, subd. (b)), and one prior strike within the meaning of California's "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)).  Appellant was sentenced to prison for an aggregate determinate term of 22 years, 8 months, plus an aggregate indeterminate term of 158 years to life.  The indeterminate term included two years for two prior prison terms (§ 667.5, subd. (b)).  The court directed that appellant shall serve the determinate sentence prior to serving the indeterminate sentence.

Appellant contends that, as to all of the convictions except the three convictions for assault with a deadly weapon, the evidence is insufficient to support the gang allegations.  In addition, he claims that his trial counsel was ineffective because counsel failed to object to a portion of a jury instruction on eyewitness identification.  Finally, appellant argues, and the Attorney General concedes, that the two one-year enhancements for prior prison terms must be stricken because of an amendment

2

to section 667.5, subdivision (b).  We strike the prior prison terms and affirm in all other respects.

*Facts*

<u>Three Counts of Assault with a Deadly Weapon</u>

Appellant was a member of the Temple Street criminal street gang.  One evening in March 2017, E.P. (husband) and his wife, V.P. (wife), were eating dinner at a restaurant within the territory claimed by the Temple Street gang.  Appellant entered the restaurant and "looked at . . . husband with . . . a bad face."  "He was mad-dogging [husband] . . . ."  " ['M]ad-dogging['] . . . is street vernacular for staring at him to intimidate him."  Husband and appellant exchanged words.  "[A] verbal altercation between the two took place."

Husband and wife finished their meal and got up to leave.  As they were walking toward the exit, appellant ran toward husband and tried to hit him.  Wife "got in between" appellant and husband.  Appellant kicked wife in the "left side" of her "inner thigh."  He picked up the base unit of the restaurant's telephone and threw it at either husband or wife.  The base unit hit wife in the head, causing a wound that began to bleed.  Appellant was yelling, "'This is Temple Street.'"

In an apparent attempt to mollify appellant, husband said he knew "Thumper," a member of the Temple Street gang.  Appellant replied, "'He ain't shit in our neighborhood.' . . . 'Fuck him.'"  Appellant hit husband and wife with a cane.  Appellant was yelling, "'This is Temple Street, this is Temple Street.'"

Husband and wife left the restaurant, drove away, and contacted the police.  Husband told the police that the assailant had said, "'I'm from Temple Street, and I will get my homies to come through.'"

3

Appellant was arrested for the assault at the restaurant. Thumper told husband's and wife's relatives that husband/wife should "not . . . go to court and not . . . testify."

<u>Remaining Seven Counts Based on Shooting</u>

Husband and wife came to court for the preliminary hearing, but did not see appellant. They remained in the witness waiting room. Wife told detectives about Thumper's warning and said she was afraid to testify against appellant. The prosecutor obtained a protective order for wife and her family. Appellant, who was out on bail, was served with the protective order in open court. The preliminary hearing was continued.

Wife was horrified when she read the protective order served on appellant. The order stated her name, home address, and the names of her children. Wife complained to a detective, "'You just basically gave [appellant] the keys to my house.'"

Husband's and wife's son, J.P. (son), lived at his parents' home with his wife, D.V. Early one morning after the protective order had been served on appellant, son was in his car at home waiting for D.V. so he could drive her to work. It was the day before appellant was supposed to participate in a live lineup in the restaurant assault case. Son and D.V. were not aware of the assault or Thumper's warning. Husband and wife said nothing about the incident to son and D.V. because they "didn't want to spook [their] kids out."

Son was seated in the driver's seat. Appellant approached the driver's side and told son to lower his window. Son complied. Appellant said, "'You're [wife's] son; right?'" Son answered, "'Yeah.'" Appellant warned, "'You need to tell your mom that she better not show up to court.'" "'She better not show up to the fucking lineup tomorrow.'" Son said, "'Well, who are you?'"

4

Appellant replied, "'She knows who the fuck I am.  Better tell her that I'm gonna hurt you guys.'"  Appellant displayed the form of a gun under his sweater.  A car alarm sounded, and appellant ran "down the driveway."

D.V. entered son's vehicle.  Son slowly drove away and stopped at a nearby stop sign.  Appellant was waiting for him there.  Son persisted in questioning appellant as to his identity.  Appellant removed a gun from under his sweater and "just open[ed] fire on us."  He fired six to eight times.

D.V. was shot three times – in the stomach, right leg, and left hand.  She had "open stomach surgery."  Son was shot twice – in the shoulder and the back of the head.

*Gang Expert's Testimony*

A gang expert testified:  "Temple Street's been around since 1923. . . .  So . . . you have multiple generations of this gang.  You also have multiple generations of people who have lived in this area, who've known of Temple Street . . . .  [¶] . . . [T]hey've seen the shootings, seen the murders, they've seen the robberies . . . ."  When a Temple Street gang member yells the name of his gang within hearing distance of other persons, he "not only is identifying himself with that gang, but he's also using the established reputation of that gang to intimidate people around him."

The expert noted how engendering fear in the community serves the purpose of the gang:  "[I]f you have a gang [such as Temple Street] within a community, and the residents of that community know that this gang . . . is willing to use violence or is a violent gang, it creates an atmosphere of fear within that community.  And once that [fear] takes . . . ahold of that community, . . . you have community members who are more

5

hesitant to cooperate with law enforcement [out of concern for retaliation by the gang].  [¶]  So . . . you have victims who won't report a crime . . . ; you have witnesses  . . . who won't cooperate or won't come forward with the police.  [¶] . . . [T]hat . . . emboldens the gang."

The prosecutor presented the gang expert with a hypothetical that tracked the facts underlying the assault at the restaurant.  The expert opined that the gang member "did . . . the acts for the benefit of the gang."  The expert explained:  When the gang member announced, "This is Temple Street," he was saying "he's got an entire gang behind him."  The gang benefited from the member's announcement and attack on husband/wife because his actions would enhance the gang's reputation for violence and would "create[] this atmosphere of intimidation and fear within the community."  "Now you have potential witnesses, and maybe even future victims, who will be hesitant to cooperate with law enforcement."

The gang member's assault "would enhance his status within the gang."  Gangs "equate violence with respect.  So the more violent a particular gang member . . . or a gang is, the more they're respected, and their reputation . . . is enhanced."

The prosecutor added facts to the hypothetical that tracked appellant's shooting of son and D.V.  The expert opined that the shooting "was done for the benefit of the gang."  The expert explained:  The shooting shows "that Temple Street . . . will take the ultimate step to prevent any potential witnesses or victims from testifying in court."  "Now you have an individual who has committed that ultimate act, and he's associated with this . . . gang. . . .  [I]f anybody ever gets involved with Temple Street, either they're a witness or victim, they know that this gang has

6

committed this act and it would strongly . . . dissuade anybody from cooperating with police." The shooter personally benefited because the violence of his act elevated "his level of status within the gang."

*Substantial Evidence Supports Gang*
*Enhancements as to the Shooting*

Appellant argues that the evidence is insufficient to prove the gang enhancements as to the seven counts based on his shooting of son and D.V. "In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

"Under the terms of the gang enhancement statute, the enhancement applies to 'any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .' (§ 186.22, subd. (b)(1).) Thus, the trial court can impose the enhancement only if the prosecution establishes both of the

7

following elements beyond a reasonable doubt: first, that the defendant committed a felony (a) for the benefit of, (b) at the direction of, or (c) in association with a criminal street gang; and second, that in connection with the felony, the defendant harbored the *specific intent* to (a) promote, (b) further, or (c) assist in any criminal conduct by gang members." (*In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1358.) As to the specific intent element, "'[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense.'" (*People v. Rios* (2013) 222 Cal.App.4th 542, 567-568 (*Rios*); see also *People v. Miranda* (2011) 192 Cal.App.4th 398, 411 ["There is rarely direct evidence that a crime was committed for the benefit of a gang. For this reason, 'we routinely draw inferences about intent from the predictable results of action . . .'"].)

Appellant asserts: "Apart from [his] gang status, . . . there was no evidence [other than the gang expert's opinion] that the shooting . . . [was] committed for the benefit of Temple Street." "Nor was there any evidence that Temple Street's status or reputation had been enhanced due to the violent nature of appellant's crimes." "At the time of the shooting, neither [son] [n]or [D.V.] knew that the suspect was a gang member charged in a gang-related case. Nor did appellant do anything to let them know. Appellant did not shout out the gang's name, or make gang symbols. . . . There was no evidence that the shooting was in Temple Street territory. Likewise, there was no evidence that appellant's status or reputation for violence increased within the Temple Street gang." "[T]here was no evidence that other gang members were involved in the shooting. . . . [A]ny person charged with a crime, not only a gang member, would benefit by violently

8

attempting to prevent a witness from testifying by attempting to murder the witness's relatives . . . ." The "facts reasonably indicate . . . that appellant acted alone."

Appellant is viewing the shooting with blinders on. The shooting must be viewed together with the earlier assault on son's parents at the restaurant. When appellant committed the earlier assault, he made clear he was acting for the benefit of Temple Street. He repeatedly invoked the gang's name: "'This is Temple Street, this is Temple Street.'" At the subsequent shooting of son and D.V., there was no need for appellant to again invoke the gang's name. Any reasonable person in the community, and certainly son's parents, would understand the message of the shooting – if you bring charges against appellant or other West Temple gang members, your family will face life-threatening retribution. When son asked appellant to identify himself, appellant replied, "'She [son's mother] knows who the fuck I am.'" Appellant understood that son's mother would realize he was the gang member who had assaulted her at the restaurant.

It did not matter whether the shooting was committed in the gang's territory. The frightening message would be the same irrespective of where the shooting had occurred. Based on the gang expert's testimony, the jury could reasonably infer that the shooting would benefit the gang because it would deter the public from reporting gang crimes and from cooperating in the investigation and prosecution of such crimes. The jury could also reasonably infer that the brutality of the shooting would enhance both the gang's and appellant's reputation for violence. This would increase respect for the gang and elevate appellant's stature within the gang.

9

The evidence as to the gang enhancements was not insufficient because appellant acted alone during the shooting. (*Rios, supra*, 222 Cal.App.4th at p. 564 ["the section 186.22(b)(1) gang enhancement may be applied to a lone actor"].) Nor was it insufficient because the shooting personally benefited appellant by having the potential of dissuading witnesses from testifying against him in the restaurant assault case. A reasonable trier of fact could find beyond a reasonable doubt that appellant specifically intended to promote criminal gang activity by instilling fear in the community, thus facilitating the gang's commission of crimes with impunity. (See *People v. Vazquez* (2009) 178 Cal.App.4th 347, 353 ["A reasonable jury could infer . . . that appellant intended for the Lopez murder to have the predicted effect of intimidating . . . neighborhood residents, thus facilitating future crimes committed by himself and his fellow gang members"].)

*Counsel Was Not Ineffective*

Appellant contends that trial counsel was constitutionally ineffective for not objecting to the portion of CALCRIM No. 315 providing that, "[i]n evaluating identification testimony," the jury should consider "[h]ow certain" a witness was "when he or she made an identification." We refer to this portion of the instruction as "the certainty factor."

"To establish constitutionally inadequate representation, a defendant must show that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings,

10

the result would have been more favorable to the defendant." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1057-1058.)

Counsel's representation was not deficient. An objection to the certainty factor would have been futile. Three years earlier, our state Supreme Court upheld the inclusion of the certainty factor in a similar jury instruction (CALJIC No. 2.92) on eyewitness identification. (*People v. Sanchez* (2016) 63 Cal.4th 411, 461-462.) The court noted that, in a prior opinion, "[w]e specifically approved CALJIC No. 2.92, including its certainty factor. [Citation.] We have since reiterated the propriety of including this factor. [Citation.]" (*Id.* at p. 462.) Pursuant to the principle of stare decisis, the trial court was required to follow *Sanchez*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387.)

Even if counsel's performance had been deficient, appellant would not have been prejudiced in view of our state Supreme Court's recent decision in *People v. Lemcke* (2021) 11 Cal.5th 644, (*Lemcke*). The Supreme Court concluded that the defendant had "failed to establish that the trial court's decision to include the certainty factor in CALCRIM No. 315 violated his due process rights or otherwise constituted error under the circumstances presented here." (*Id.* at p. 669.) The Supreme Court reasoned: "[W]e find nothing in CALCRIM No. 315's instruction on witness certainty that operates to 'lower the prosecution's burden of proof.' . . . [T]he instruction does not direct the jury that 'certainty equals accuracy.' [Citation.] Nor does the instruction state that the jury must presume an identification is accurate if the

11

eyewitness has expressed certainty. [Citation.] Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony. The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315. Indeed, even [the defendant] acknowledges that, on its face, the instruction is 'superficially neutral.'"[2] (*Id*. at p. 657.)

*The One-Year Prior Prison Terms Must Be Stricken*

Appellant was sentenced in August 2019. Effective January 1, 2020, Senate Bill No. "136 amended Penal Code section 667.5, subdivision (b) such that a one-year enhancement for a prior prison term shall be imposed only if the prior term was for a sexually violent offense." (*People v. Winn* (2020) 44 Cal.App.5th 859, 872.) "The trial court imposed [two] one-year terms under the prior version of . . . section 667.5. None of the prior prison terms was imposed for a sexually violent offense as defined by the amended version of section 667.5." (*Ibid*.) "The Attorney General concedes the merit of [appellant's] claim [that

---

[2] Nevertheless, the Supreme Court stated: "[W]e believe there is a risk that the current version of the instruction will prompt jurors to infer that an eyewitness's certainty in an identification is generally a reliable indicator of accuracy. Accordingly, in the exercise of our supervisory powers, we direct our trial courts to omit the certainty factor from CALCRIM No. 315 until the Judicial Council has the opportunity to consider how the language might be better worded to minimize juror confusion on this point." (*Lemcke, supra,* 11 Cal.5th at p. 669.)

the two prior prison terms must be stricken]. [¶] The concession is well-taken." (*Ibid*.) "Accordingly, we will strike the [two prior prison term] enhancements, modify the sentence, and affirm the judgment as modified." (*Id*. at p. 873.)

*Disposition*

The two one-year enhancements imposed for prior prison terms under section 667.5, subdivision (b) are stricken, and the aggregate indeterminate term is reduced from 158 years to life to 156 years to life. The aggregate determinate term remains the same – 22 years, 8 months. As modified, the judgment is affirmed. Upon issuance of the remittitur, the trial court shall send an amended indeterminate abstract of judgment along with the original determinate abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


YEGAN, Acting P. J.

We concur:


PERREN, J.


TANGEMAN, J.

13

Eleanor J. Hunter, Judge

Superior Court County of Los Angeles

_____

Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Colleen M. Tiedemann, Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.